**2023 UT 20**

IN THE

**SUPREME COURT OF THE STATE OF UTAH**

STATE OF UTAH,
*Appellant*,

*v.*

KOLBY RYAN BARNETT,
*Appellee*.

No. 20220636
Heard May 15, 2023
Filed September 21, 2023

On Appeal of Interlocutory Order
On Certification from the Court of Appeals

Second District, Farmington
The Honorable Rita M. Cornish
No. 221700665

Attorneys[1]

Troy S. Rawlings, Cnty. Att'y, Jeffrey G. Thomson, Deputy Cnty.
Att'y, Farmington, for appellant

Emily Adams, Freyja Johnson, Sara Pfrommer, Cherise M. Bacalski,
Bountiful, Todd Utzinger, Farmington, for appellee

ASSOCIATE CHIEF JUSTICE PEARCE authored the opinion of the Court,
in which CHIEF JUSTICE DURRANT, JUSTICE PETERSEN,
JUSTICE HAGEN, and JUSTICE POHLMAN joined.

ASSOCIATE CHIEF JUSTICE PEARCE, opinion of the Court:

**INTRODUCTION**

¶1  Kolby Ryan Barnett was already serving probation when he was arrested and charged with felony crimes in Salt Lake and Davis counties. At Barnett's Davis County bail hearing, the State argued that article I, section 8(1) of the Utah Constitution mandates that a judge

---

[1] Attorneys for *amicus curiae* Utah Association of Criminal Defense Lawyers: David A. Ferguson and Jeremy M. Delicino, Salt Lake City.

deny bail to a defendant charged with a felony if that defendant is already serving probation on a felony conviction. The district court rejected the State's constitutional interpretation and set bail.

¶2 Article I, section 8(1) guarantees a right to bail in most circumstances, but it outlines three instances where bail is not guaranteed. We conclude that the people of Utah did not intend to constitutionally strip judges of the ability to grant bail in those three circumstances. In other words, an alleged "double felony defendant" like Barnett is not guaranteed bail, but the constitution does not forbid the district court from setting bail. We are not asked to review the district court's bail decision on the merits, and so we affirm.

## BACKGROUND

¶3 Barnett was serving probation for a felony conviction when both Salt Lake and Davis counties charged him with several new felonies. At his Davis County bail hearing, the State opposed Barnett's pre-trial release.

¶4 Relying on article I, section 8(1) of the Utah Constitution (Bail Provision), the State argued that the district court was constitutionally prohibited from granting Barnett bail. Part of that provision reads: "All persons charged with a crime shall be bailable except . . . persons charged with a felony while on probation or parole, or while free on bail awaiting trial on a previous felony charge, when there is substantial evidence to support the new felony charge." UTAH CONST. art. I, § 8(1)(b).[2]

¶5 There was no dispute that Barnett was a "person[] charged with a . . . felony while on probation or parole." *Id.* Nor was there any dispute that substantial evidence supported the new charges. The question before the district court boiled down to what the Utah Constitution means when it provides: "All persons charged with a crime shall be bailable except" those falling into certain categories. The State argued that this meant a district court was prohibited from setting bail for anyone to whom the exceptions applied.

---

[2] Article I, section 8(1) has two other subsections containing exceptions to the right to bail: (1) those charged with a capital offense when substantial evidence supports the charge, and (2) those charged with a crime statutorily exempted from the right when substantial evidence supports the charge, and the judge finds by clear and convincing evidence that the defendant constitutes a substantial danger or flight risk. UTAH CONST. art. I, § 8(1)(a), (c).

¶6 Barnett argued "shall be bailable except" meant that though the person charged was not guaranteed bail, a district court could still grant it. The district court accepted Barnett's interpretation and set bail.

¶7 The State seeks interlocutory review. The State argues that the district court erred when it concluded it had discretion to grant Barnett bail. The State further contends that the district court misconstrued the Bail Provision's plain language to reach its result. Lastly, the State argues that the district court should have looked to the original public meaning of the Bail Provision and that if it had, the district court would have learned that the people of Utah understood they were removing a judge's discretion to grant bail to certain categories of defendants.[3]

## STANDARD OF REVIEW

¶8 "We review constitutional interpretation issues for correctness, granting no deference to the district court." *Richards v. Cox*, 2019 UT 57, ¶ 7, 450 P.3d 1074.

## ANALYSIS

¶9 The district court interpreted the Bail Provision to guarantee bail in most instances. It further concluded that the Bail Provision does not guarantee bail in the three outlined exceptions. But the district court also concluded that the provision does not forbid the court from granting bail in those circumstances. The State argues that the district court misread the plain language to reach this conclusion. The State posits that the district court "advanced a present-day, plain-language-only construction" of the constitution. The State predicts that if the district court had properly focused on the original public meaning of the Bail Provision, it would have decided that the people of Utah intended to prohibit bail in certain circumstances.

¶10 When we interpret the Utah Constitution, the "text's plain language may begin and end the analysis." *South Salt Lake City v. Maese*, 2019 UT 58, ¶ 23, 450 P.3d 1092. But unlike other forms of analysis, "constitutional inquiry does not require us to find a textual ambiguity before we turn to . . . sources" outside the text. *Id.* Parties can present courts with evidence that the plain language would have been understood differently by those who put that language into the constitution. This means that while "the text is generally the best place

---

[3] Barnett moved to strike the State's response to the Utah Association of Criminal Defense Lawyers' amicus brief. Because we rule in Barnett's favor, we need not address the motion to strike.

to look for understanding, historical sources can be essential to our effort to discern and confirm the original public meaning of the language."[4] *Id.*

¶11 Before we turn to the State's arguments, it is helpful to understand the evolution of the language the district court interpreted. The original Bail Provision read: "All prisoners shall be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption strong." UTAH CONST. art. I, § 8 (1896).

¶12 Voters expanded the exception in 1973 to include defendants in Barnett's circumstance. After the amendment, the constitution read:

> All prisoners shall be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption strong or where a person is accused of the commission of a felony while on probation or parole, or while free on bail awaiting trial on a previous felony charge, and where the proof is evident or the presumption strong.

UTAH CONST. art. I, § 8 (1973).

¶13 In 1988, the voters overhauled the Bail Provision. Voters changed "All prisoners shall be bailable by sufficient sureties" to "All persons charged with a crime shall be bailable except." *Compare* UTAH CONST. art. I, § 8 (1973) *with* UTAH CONST. art. I, § 8(1) (1989). The voters also added a new exception to the bail guarantee by giving the Legislature the ability to statutorily designate crimes for which a court could deny bail. *See* UTAH CONST. art. I, § 8(1)(c).

¶14 The voters additionally changed the Bail Provision's structure by separating and individually lettering each of the three exceptions. After passage, the provision reads:

> (1) All persons charged with a crime shall be bailable except:

---

[4] To determine the original public meaning, we "interpret the Constitution according to how the words of the document would have been understood by a competent and reasonable speaker of the language at the time of the document's enactment." *Maese*, 2019 UT 58, ¶ 19 n.6 (quoting John O. McGinnis & Michael B. Rappaport, *Original Methods Originalism: A New Theory of Interpretation and the Case Against Construction*, 103 NW. U. L. REV. 751, 761 (2009)).

(a) persons charged with a capital offense when there is substantial evidence to support the charge; or

(b) persons charged with a felony while on probation or parole, or while free on bail awaiting trial on a previous felony charge, when there is substantial evidence to support the new felony charge; or

(c) persons charged with any other crime, designated by statute as one for which bail may be denied, if there is substantial evidence to support the charge and the court finds by clear and convincing evidence that the person would constitute a substantial danger to any other person or to the community or is likely to flee the jurisdiction of the court if released on bail.

UTAH CONST. art. I, § 8(1).

¶15   The State presents two arguments. The State first focuses on the language "shall be bailable except." The State claims that "bailable" means able to be bailed and that double felony defendants are "excepted" from being able to be bailed. This prompts the State to argue that the district court erred because the Bail Provision's plain language means that judges do not have discretion to grant bail to double felony defendants.

¶16   The State also claims that a form of the phrase "shall be bailable except" was present in the original constitution. And that historically, that language had meant that anyone meeting the exception was not eligible for bail. The State contends that this meaning would have been apparent to the people of Utah in 1895 when they put it into the original constitution. The State also argues that the voters who amended the Bail Provision in 1973 and 1988 would have shared that understanding. This permits the State to argue that "shall be bailable except" meant the same thing in 1988 that it meant in 1895 and that it carries that meaning today.

¶17   We disagree. The Bail Provision's plain language provides that a defendant is guaranteed bail in all but a few circumstances and that in those instances, the district court may still grant bail. This conclusion does not change when we look at what the people of Utah would have understood the Bail Provision to mean in 1988.

## I.   THE BAIL PROVISION'S PLAIN LANGUAGE GUARANTEES BAIL TO MOST DEFENDANTS BUT PROVIDES THAT A COURT MAY DENY IT TO OTHERS

¶18   The State claims that the district court erred in its analysis of the Bail Provision's plain language. The State posits that the district

court's interpretation "neither mirrors nor gives effect to all of Subsection 8(1)'s actual and precise terms."

¶19   The State's plain language argument first focuses on the term "bailable." The State contends that the suffix "able" "has long meant 'capable of, fit for, or worthy of.'" (Quoting *-able*, https://www.merriam-webster.com/dictionary/able (last visited July 16, 2023)). The State argues that the word "bailable" therefore means "capable, fit, worthy, competent, or qualified for 'bail.'" If a person is bailable, then "bail 'may be' granted." In other words, if a person is bailable, the court is "authorized" to grant them bail.

¶20   The State further argues that bail may not be granted to double felony defendants because the term "bailable" is followed by the word "except." The State maintains that "except" "has been ordinarily understood to mean 'exclude.'" In the State's reading, double felony defendants are "constitutionally excluded from being bailable." Because they are excluded from being "bailable," courts are not authorized to grant double felony defendants bail. So, according to the State, "a court [that] is without discretion, is not 'authorized,' to give [bail]."

¶21   The State offers a plausible reading of the Bail Provision. But when the Bail Provision is read in context, a different meaning becomes apparent.

¶22   As an initial matter, no express language in the Bail Provision states that bail cannot be granted to double felony defendants. Moreover, the language the State uses to read the prohibition into the provision—"shall be bailable"—is followed by three exceptions. The third of these exceptions, found in subsection (1)(c), states that those "charged with any other crime, designated by statute as one for which bail may be denied," are also excepted from the right to bail. Because the subsection recognizes that the Legislature will designate crimes for which bail *may* be denied, "[s]hall be bailable except" in that instance could not be—as the State argues—a phrase that categorically denies anyone listed in subsection (1)(c) the ability to be granted bail. *See* UTAH CONST. art. I, § 8(1)(c) (emphasis added). Tellingly, subsection (1)(c) does not provide that the Legislature can designate crimes for which bail *must* be denied. This undercuts the State's contention that "shall be bailable" must be read as a precursor to a constitutional bar on the grant of bail.

¶23   The Bail Provision's location in the constitution also subverts the State's interpretation. *See State ex rel. Salt Lake City v. Eldredge*, 27 Utah 477, 76 P. 337, 339 (1904) (providing that "in construing a

particular section [of the constitution], the court may refer to any other section or provision to ascertain" the meaning of the provision). The guarantee of "bailability" resides in article I of the constitution. Article I, titled "Declaration of Rights," enumerates some of Utahns' "inherent and inalienable right[s]."[5] Article I is home to several guarantees of individual liberty, including the free exercise of religion (section 4), due process of law (section 7), and the right to trial by jury (section 10). It follows, then that "shall be bailable" does more than proclaim who is eligible for bail—as the State claims. The Bail Provision's placement in the Declaration of Rights strongly suggests that "shall be bailable" is a guarantee of the right to bail.

¶24   This reading comports with how we have interpreted the Bail Provision. We have said many times that the Bail Provision provides a right to bail. In *Scott v. Ryan*, for example, we held that "[t]he provision affirms the fundamental right to bail of one accused of a crime." 548 P.2d 235, 236 (Utah 1976); *see also Randolph v. State*, 2022 UT 34, ¶ 15, 515 P.3d 444 ("By inference, Article I, Section 8 of the Utah Constitution guarantees bail as a matter of right.") (cleaned up). The State's proffered construction of "bailable" would effectively overturn those cases and replace the guarantee of bail with a guarantee of an opportunity to seek bail.

¶25   The State leans into that novel construction and cites article I, section 26 of the constitution for support. Section 26 states: "The provisions of this Constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise." UTAH CONST. art. I, § 26.

¶26   The State then argues the "may" in subsection 8(1)(c) means that the subsection is not "mandatory and prohibitory" and contrasts that with subsections 8(1)(a) and (b) (regarding capital offenders and double felony defendants). The State claims that this contrast highlights that 8(1)(a) and (b) are "mandatory and prohibitory" subsections, a conclusion that requires the court to infer that the exceptions in subsections 8(1)(a) and (b) involve crimes for which bail *must* be denied. In the State's view, this "forecloses a court's ability to infer some residual discretion" into subsections 8(1)(a) and (1)(b). In other words, the State contends that the permissive "may" in subsection 8(1)(c) does not give the court discretion to grant bail when the charged offense falls under subsections 8(1)(a) or (1)(b). The State

---

[5] The constitution does not list all rights guaranteed to the people of Utah. UTAH CONST. art. I, § 25 ("This enumeration of rights shall not be construed to impair or deny others retained by the people.").

concludes "[i]nsofar as Subsection 8(1) grants a right," the district court correctly "recognized the rule's mandatory nature." But, says the State, the district court erred because "insofar as Subsection 8(1) withholds a right, the court ignored its corresponding prohibitory exception."

¶27 We have stated that "[a]rticle I, section 26 rivets [all] . . . rights in the Declaration of Rights[] into the fundamental law of the State and makes them enforceable in a court of law." *Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 676 (Utah 1985). Section 26 means that because each part of the constitution is "mandatory and prohibitory," courts cannot ignore the constitution. That is, courts are not free to pick and choose which parts of the constitution they will enforce.

¶28 At least, this was the understood meaning of section 26 at the Constitutional Convention in 1895. *See* PROCEEDINGS AND DEBATES OF THE CONVENTION ASSEMBLED TO ADOPT A CONSTITUTION FOR THE STATE OF UTAH, DAY 23 (Mar. 26, 1895), https://le.utah.gov /documents/conconv/23.htm. At the convention, one delegate said the provision "only has such significance as the law gives it. . . . It is simply a declaration of what the bill of rights is." *Id.* Another delegate suggested amending this language in a way that was "scarcely a change in substance" so that it would begin with the purpose of the amendment: "To guard against transgression of the high powers we have []delegated to the government of the State of Utah." *Id.* A motion to adopt that amendment ultimately failed, but it still sheds light on the provision's original meaning: the government must obey the constitution. *See id.*

¶29 Other states have interpreted their section 26 analogs similarly. The California Supreme Court read an identical provision in the California Constitution to determine "all branches of government are required to comply with constitutional directives or prohibitions." *Katzberg v. Regents of Univ. of Cal.*, 58 P.3d 339, 342 (Cal. 2002) (cleaned up). The Arizona Supreme Court interpreted similar language in the Arizona Constitution to hold that "the word 'mandatory' as used in this Constitutional provision is defined as a command and hence obligatory, which we must implicitly follow and obey." *Schock v. Jacka*, 460 P.2d 185, 188 (Ariz. 1969).

¶30 Against this backdrop, we can conclude the State incorrectly asserts that section 26 has much to tell us about what the Bail Provision means.

¶31 Simply put, the district court correctly interpreted the Bail Provision's plain language.

## II. THE VOTERS WHO AMENDED THE BAIL PROVISION IN 1988 WOULD HAVE UNDERSTOOD THAT THE CONSTITUTION GIVES JUDGES DISCRETION TO GRANT BAIL TO DOUBLE FELONY DEFENDANTS

¶32 As noted above, the Utah Constitution's plain language may not always end the debate over a provision's meaning. *See South Salt Lake City v. Maese*, 2019 UT 58, ¶ 23, 450 P.3d 1092. We leave open the opportunity for a party to show that the original public meaning of the constitution differs from the result the plain language suggests. *See id.* ¶ 28 ("We start by acknowledging that the plain language of the Utah Constitution does not answer the question. . . . We therefore examine the historical record for evidence . . . .").

¶33 The State avails itself of this opportunity and argues that the district court erred when it failed to consider the Bail Provision's original public meaning. The State insists that if the court had looked at the history of the provision, it would have seen that the phrase "shall be bailable . . . except" was a legal term of art "with a well-understood and established meaning." The State contends that phrase has long meant that a "criminal defendant who falls within an enumerated exception to bailability is nonbailable—'shall not be bailable'—by the courts."

¶34 The State asserts that this phrase and its meaning can be traced back to the 1682 Frame of Government of Pennsylvania. *See Laws Agreed Upon in England*, art. XI (May 5, 1682), *available at* https://avalon.law.yale.edu/17th_century/pa04.asp. According to the State, "shall be bailable . . . except" (with some variation) and its application to capital offenders was adopted into the Northwest Territory Ordinance, several other state constitutions, and Utah territorial laws.

¶35 The State appears to have a point about the historical meaning of the phrase. Several—but not all—states interpreted "shall be bailable . . . except" to exclude capital offenders from the opportunity of receiving bail. *See, e.g.*, *State v. Horn*, 19 Tenn. 473, 476 (1838); *State v. Frith*, 14 La. 191, 197 (1839); *but see State v. Hartzell*, 100 N.W. 745, 746 (N.D. 1904) (holding that two people charged with first-degree murder were "not entitled to bail as a strict legal right" and that "[t]he allowance of bail [was] then a matter of judicial discretion").

¶36   The State asserts that this is what Utah voters would have understood that language to mean when they placed it in Utah's initial constitution. We see nothing to contradict that assertion. There was little debate on the provision's meaning at the constitutional convention. And as noted above, many sister states had interpreted that language in a similar fashion at the time of Utah's statehood.

¶37   The State then argues that the double felony defendant provision, ratified by the voters in 1972, "was understood to mean and operate the same as the capital offender exception." The State claims that because the capital offender provision never allowed judges the discretion to grant capital offenders bail, the voters in 1972 would have understood that they were placing the same restriction on judges when it came to double felony defendants.

¶38   The State points to *Scott v. Ryan* as evidence of this interpretation. 548 P.2d 235 (Utah 1976). There, we said that the double felony defendant exception "represents an intention to create a classification of comparable gravity" to the "capital offense exception." *Id.* at 236. Again, we see little in the historical record that would contradict the State's assertion that the voters in 1972 would have expected the Bail Provision to operate as it did in 1895.

¶39   Next, the State claims that the 1988 amendment "reaffirmed that the Framers understood the text to preclude bailability from an enumerated class." All the State offers to buttress this assertion are comments from the 1988 Senate floor debates on the joint resolution that sent the amendment to the voters. *See infra* ¶¶ 67–72. The State asserts that because "[t]he 1988 Framers' understanding was the same as that of the 1971 and the original Framers," Utahns in 1988 would also understand these provisions to be non-discretionary.

¶40   Before we test the strength of the State's arguments, we need to decide the relevant time frame to examine the meaning of the Bail Provision.

¶41   When we interpret unamended constitutional language, we examine the original public meaning when voters first approved the text. But when the voters have amended the language, "we look to the meaning that the public would have ascribed to the amended language when it entered the constitution." *Randolph v. State*, 2022 UT 34, ¶ 68, 515 P.3d 444 (cleaned up).

¶42   *Patterson v. State* provides an example of this. 2021 UT 52, 504 P.3d 92. There, we were asked to determine if "our constitutionally granted writ authority" encompassed "post-conviction petitions." *Id.* ¶¶ 86–87. This required us to interpret the meaning of the

constitutional provision that "invested its Supreme Court with 'original jurisdiction to issue all extraordinary writs' and its district courts with 'power to issue all extraordinary writs.'" *Id.* ¶ 93 (quoting UTAH CONST. art. VIII, §§ 3, 5).

¶43   The original 1896 constitution "contained language granting writ authority to the courts." *Id.* ¶ 88. But the specific phrase "extraordinary writs" entered our constitution in 1984, when "the judicial article of the constitution was repealed and replaced with new language." *Id.* Patterson and the State disagreed "about what the original public meaning of the constitutional language is, as well as at what point we should measure that meaning." *Id.*

¶44   We rejected the State's argument that we should interpret the language as it would have been understood in 1895. We instead held that 1984 was the correct year to assess the meaning of the constitutional language. *Id.* ¶¶ 130–42. We said:

> What the State advocates is fundamentally inconsistent with the logic of an original public meaning interpretive approach. To accept the State's argument would require us to accept that in 1984, the public evaluating the proposed amendment would have understood that by returning the word "writ" to the constitution, they were not using the term as they generally understood it, but as people in 1895 would have understood it.

*Id.* ¶ 138 (cleaned up).

¶45   And in *Patterson*, the State presented no evidence to support its assertion that the people of Utah in 1984 would have understood that by inserting the word "writ" into the constitution, they were giving it the meaning it carried in 1895. *Id.* ¶ 137. Without evidence that voters "intended the amended language to carry a meaning from the previous century," we concluded that it would be "unreasonable to look back to the time of statehood to understand language the voters approved in 1984." *Id.* ¶ 137.

¶46   That is not to say that the people cannot re-enshrine an earlier understanding of constitutional language when they amend the constitution. In *State v. Kastanis*, we were asked to determine the "quantity of proof necessary to support a denial of bail" for capital offenders. 848 P.2d 673, 674 (Utah 1993) (per curiam). The language we needed to interpret had entered the constitution in 1988. The voters had amended the Bail Provision to provide that bail can be denied to defendants charged with a capital offense "when there is substantial evidence to support the charge." *Id.* (quoting UTAH CONST.

art. I, § 8(1) (1989)). The amendment modified the previous standard that said that bail could be denied "when the proof is evident or the presumption strong." *Id.* (quoting UTAH CONST. art. I, § 8 (1896)) (also referred to as the proof evident-presumption strong standard).

¶47   We noted that "[i]t would be reasonable to assume an intent to make a substantive change in the law when the voters change the language of the constitution." *Id.* at 675. But we ultimately concluded that the assumption was not warranted because the evidence before us suggested that the voters did not intend to substantively change the standard. *Id.*

¶48   To reach that conclusion, we examined the minutes from a meeting of the Utah Constitutional Revision Commission. *Id.* These minutes described that a member of the Utah Supreme Court Criminal Rules Committee had reported that "most lawyers do not understand the standard of 'proof evident-presumption strong' because it is archaic." *Id.* The change to "substantial evidence" was suggested because that language was "more understandable." *Id.*

¶49   Our review of "succeeding considerations of the amendment" also supported our determination that the change was seemingly "accomplished in a perfunctory manner and for the sole purpose of modernizing the language." *Id.* The "succeeding consideration" we looked to was the 1988 voter guide, which informed voters that the new language was "more commonly used and understood by the courts and attorneys." *Id.* (quoting *Proposition No. 1 Bail Amendment*, *in* UTAH VOTER INFORMATION PAMPHLET 1, 7 (1988), https://elections.utah.gov/Media/Default/historical%20VIPs/1988%20VIP.pdf).

¶50   On that record, we determined that "[t]he voters were thus informed, and undoubtedly understood, that no substantive change would be effected." *Id.* Because our historical analysis demonstrated that "no substantive change was intended . . . in amending section 8," we determined that "the new language should be applied in the same way as the previous language." *Id.* And we did so because that is what the voters would have understood they were doing when they amended the constitution.

¶51   Likewise, in *Randolph v. State*, we again "interpret[ed] what the people of Utah intended 'substantial evidence' to mean [in 1988] when they voted it into article I, section 8 of the constitution."2022 UT 34, ¶ 56. We determined that people in 1988 understood a "substantial evidence" standard to have the same meaning as the earlier "proof evident-presumption strong" standard. *Id.* ¶¶ 59–64.

¶52 Following our logic in *Kastanis*, we again quoted the minutes from the Utah Constitutional Revision Commission and the 1988 voter guide. *Id.* ¶¶ 58, 60–61. After reviewing those sources, we explained that when the voters in 1988 amended the constitution to change "proof is evident or the presumption strong" to "substantial evidence," they understood that they were not changing the substantive standard. *Id.* ¶¶ 60–61, 64. We thus determined that "the new language should be applied in the same way as the previous language." *Id.* ¶ 61.

¶53 In *Randolph*, we looked to 1988 to conduct our original public meaning analysis because that was when the voters ratified the relevant part of the constitution. We looked at the meaning of the constitutional language in years prior to 1988 because meeting minutes and the voter guide demonstrated that voters in 1988 wanted the new language to carry the earlier meaning.

¶54 Unlike in *Kastanis* and *Randolph*, the historical record here suggests that the voters in 1988 had a different understanding of how the Bail Provision operated than voters in 1895 and 1972 may have had. And the amendment that entered the constitution in 1988 is premised upon that contemporary understanding of how the Bail Provision worked.

¶55 We employ public meaning originalism because the constitution derives its authority from the democratic action of the people in whom "[a]ll political power is inherent." *See* UTAH CONST. art. I, § 2. We recognize that our constitution "enshrines principles, not application of those principles." *Maese*, 2019 UT 58, ¶ 70 n.23. Constitutional interpretation represents our effort to ascertain the principle that the people of Utah understood they were constitutionalizing. Stated differently, "the people of this state" are the "constitutionally sanctioned architects of our society." *Am. Bush v. City of South Salt Lake*, 2006 UT 40, ¶ 84, 140 P.3d 1235 (Durrant, J., concurring). That is, the people of Utah make a blueprint for our society through our constitution. *See id.*

¶56 In this instance, 1988 is the last time the people of Utah performed a major revision of the part of the blueprint that deals with bail. The voters' understanding in 1988 of how the Bail Provision functioned motivated their decisions on whether to amend the constitution. That understanding also influenced how they believed the constitution should be amended. It is this understanding that defines the principle that the constitution enshrines. That understanding is the latest word we have on how the people of Utah

want its constitution to work with respect to bail, and it is that understanding we work to discover.

¶57    The State offers us another possibility. The State suggests that we could recognize that the phrase "shall be bailable except" means one thing (based on how the State claims voters in 1895 and 1972 understood it) when interpreting subsections (1)(a) and (1)(b) of the Bail Provision but conclude that the same phrase has a different meaning when we interpret subsection (1)(c). That would require us to recognize what the precise words meant at the time they first entered the constitution and then encase them in amber and not allow them to be interpreted contrary to that meaning, even if the voters amended the constitution relying on a different understanding of what those words mean and how they operate.

¶58    Such devotion to a formal application of public meaning originalism would miss the forest for the trees. We don't seek to understand what the constitutional language meant at the time it entered the constitution because that language is imbued with magic. We seek to understand the original public meaning because it is the best place to start to understand the principle the people of Utah placed in the constitution And, in a case like this, we can best ascertain that principle if we seek to know what the people who last made a major amendment to that principle understood that principle to be. In other words, where the historical record suggests that the voters in 1988 amended the Bail Provision with an understanding of how that Bail Provision works, it is their understanding that the amendment enshrines. This requires us to turn our attention to 1988 to see what the Bail Provision meant when the voters amended it.

### A. The Voter Information Pamphlet and Other Published Materials in 1988 Support the Conclusion That the Bail Provision is Discretionary

¶59    "[T]o ascertain the original public meaning of the constitutional text, we must ask what principles a fluent speaker of the framers' English would have understood a particular constitutional provision to embody." *Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶ 96, 416 P.3d 663. We have, at times, concluded that voter guides can help us answer that question. *See Randolph*, 2022 UT 34, ¶ 58; *In re Young*, 1999 UT 6, ¶ 21, 976 P.2d 581; *Kastanis*, 848 P.2d at 673.

¶60    The 1988 voter guide told Utah voters that the existing Bail Provision, as well as the proposed amendment, gave judges discretion to grant bail to those excepted from the bail guarantee. The voter guide's "Impartial Analysis" section explained, "The state

constitution *presently allows* judges to deny bail to persons who have been charged with: (1) a capital offense; or (2) a felony while on probation or parole or while free on bail awaiting trial." *Proposition No. 1 Bail Amendment*, *in* UTAH VOTER INFORMATION PAMPHLET 1, 7 (1988), https://elections.utah.gov/Media/Default/Historical%20VI Ps/1988%20VIP.pdf (emphasis added).

¶61 In the "Arguments For" amending the Bail Provision, the voter guide stated, "The present bail provisions of the Utah Constitution do not give Utah judges *the discretion* to deny bail for charges involving serious offenses" and encouraged voting for proposition 1 so that judges could be "allowed to deny bail" in such cases. *Id.* at 8 (emphasis added).

¶62 The language of "allow[ing]" judges and "giv[ing] . . . judges the discretion" indicates that the voter guide's authors thought that the existing Bail Provision gave judges discretion to grant bail to capital offenders and double felony defendants and that the new provision would do so as well. Absent evidence pointing in the opposite direction, we can assume that voters who wanted to know what the amendment would do—and who looked to the voter guide to find out—would carry that understanding with them into the ballot box. In this instance, the understanding they would likely have taken with them was that the Bail Provision gave judges discretion to grant bail to capital offenders and double felony defendants and that the amendment they were voting on would add a new category of defendants to whom bail was available but not guaranteed.

¶63 If voters in 1988 had looked to the newspapers for a discussion about the proposed amendment, they likely would have understood that the Bail Provision gave courts discretion to deny bail in some circumstances but did not mandate denial. Opponents to the proposition penned an op-ed for *The Salt Lake Tribune* that claimed the Bail Provision "accommodates excessive interpretation" but they also acknowledged that "[c]onceivably, the state constitution's no bail limits—only in capital cases and for probationers charged with another felony—should be extended. Judges ought to be allowed *the discretion* of holding without bail suspected criminals apt to flee local court jurisdiction." Editorial, *Split Proposition Vote*, SALT LAKE TRIBUNE, Nov. 6, 1988, at A32 (emphasis added).

¶64 Contemporaneous events and reporting on court cases generally support this interpretation. An April 1988 newspaper article described how a court initially set bail at $200,000, and then lowered it to $100,000 for two men charged with a capital offense. *See* Chuck Zehnder & Rosann Fillmore, *Two Price Men Charged with Murder*, SUN

ADVOC., Apr. 5, 1988, at 1A. In 1986, newspapers reported on the legal proceedings for Steven R. James, who was charged with a capital offense and for whom bail was set at $75,000. *See, e.g., Bail Set at $75,000 for Father of Steven Roy James*, PROVO DAILY HERALD, Oct. 28, 1986, at 12. Voters who relied on the reporting of crimes to understand how the Bail Provision worked would have understood that judges possessed discretion to grant bail, even to those charged with capital crimes or double felonies.

> *B.   Legislative Materials Generally Support the Conclusion That Voters in 1988 Would Have Understood That Judges Had Discretion in Bail Cases*

¶65   The State places its eggs in a basket labeled "legislative history." The State claims that voters in 1988 who reviewed the Senate floor debates would have understood that the Bail Provision removed judges' discretion to grant bail in some circumstances. The State further contends that those debates demonstrate that the State's proffered interpretation "was the unchallenged understanding of Subsection 8(1) the Framers were left with when they voted on it."

¶66   The legislative history does not bear this out. Indeed, a voter who happened to listen to the Senate floor debates could readily conclude that the Senate did not entirely agree on what the effect of the amendment would be.

¶67   Senator Winn L. Richards was one of the sponsors of the resolution that would put the amended Bail Provision before the people for a vote. During the floor debates on the resolution, Senator Richards said the proposed constitutional amendment added additional circumstances when "a judge, in his wisdom, can deny bail." *Recording of Utah Senate Floor Debates*, at 5:14, S.J.R. 3, 47th Leg., Gen. Sess., (Jan. 25, 1988) [hereinafter *Senate Floor Debates*]; Jeffrey G. Thomson, Jr., *The Utah Constitution's Prohibitory Bail Provisions in Utah Criminal Proceedings*, 4 UTAH J. CRIM. L. 69, 87 (2019); S.J.R. No. 3, 47th Utah Leg., Gen. Sess. (1988), https://images.archives.utah.gov/digital/collection/428/id/150796/rec/1.

¶68   Senator LeRay L. McAllister, another sponsor, explained that "the judge would have discretion" to deny bail but that the resolution "doesn't say they have to, it simply allows the judge to have discretion." *Senate Floor Debates*, at 01:45; Thomson, *supra*, at 87.

¶69   Senator Darrell G. Renstrom, also a resolution sponsor, added, "No, I don't think it's giving [judges] discretion. It mandates it as long as there [is] substantial evidence that he committed the crime." *Senate Floor Debates*, at 01:54; Thomson, *supra*, at  87.

¶70 Senator Lyle W. Hillyard, who also sponsored the resolution, was asked: "You would agree, though, that once the judge has reached the judgment that there is substantial evidence . . . to convict, then at that point the judge has lost his option, hasn't he, because he's mandated by the Constitution to deny bail?" *Senate Floor Debates*, at 03:24; Thomson, *supra*, at 88.

¶71 Senator Hillyard responded: "That's correct." But Senator Hillyard added "I think that is the discretion touchstone of this bill, that if a judge . . . wanted to bail a person out, thought he ought to be eligible for bail, the court simply would not find the substantial evidence." *Senate Floor Debates*, at 03:40; Thomson, *supra*, at 88–89.[6]

¶72 Immediately before the vote, a senator said it would be beneficial "to give the judge that discretion, that they could withhold bail." *Senate Floor Debates*, at 05:32.[7]

¶73 In original public meaning analysis, "our focus is on the objective original public meaning of the text, not the intent of those who wrote it . . . . Evidence of framers' intent can inform our understanding of the text's meaning, but it is only a means to this end, not an end in itself." *Maese*, 2019 UT 58, ¶ 19 n.6. So, even though the State is correct that some legislators interpreted the Bail Provision to deny bail in certain circumstances, this information alone is not dispositive. And even within the Legislature, the question did not appear fully settled.

---

[6] The State cites a journal article that transcribes the debate and quotes Senator Hillyard as saying, "I think that is the discretion *touched on of* this bill." Thomson, *supra*, at 88 (emphasis added). Our own transcription renders the comment as, "I think that is the discretion *touchstone of* this bill." *Senate Floor Debates*, at 03:40 (emphasis added). Other minor transcription differences exist. None are material to our analysis.

[7] In 2016, Senator Hillyard sponsored a bill that provided "a magistrate or judge *may deny* pre-trial release" for capital offenders and double felony defendants, among other crimes. *See* S.B. 202, § 14, 2016 Utah Leg. Gen. Sess. (Utah Feb. 19, 2016), *available at* https://le.utah.gov/~2016/bills/static/SB0202.html (emphasis added). Although the understanding of one Senator many years after the amendment passed is not powerful evidence of how the public would have understood the language at the time of the vote, it is interesting that one of the resolution's sponsors and drafters later took the view that the Bail Provision did not mandate the denial of bail to capital offenders and double felony defendants.

¶74 In fact, Senator Richards and, notably, Senator Renstrom—who pushed back against using discretionary language to describe the resolution in the floor debate—wrote the arguments in the 1988 voter guide supporting the Bail Provision amendment. In the guide, they described that the amendment would "[g]ive judges the right to deny bail" in certain circumstances and "[r]emove unreasonable restrictions on the discretion of judges." *Arguments for Proposition No. 1 Bail Amendment*, *in* UTAH VOTER INFORMATION PAMPHLET 1, 8 (1988), https://elections.utah.gov/Media/Default/Historical%20VIPs/1988%20VIP.pdf. It is hard to conclude that Utah voters' understanding of the amendment would have been formed by the inconclusive legislative debate more than the voter guide's definitive statements.

*C. Court Cases from Utah and Sister States Would Not Have Provided Clear Insight into Whether the Bail Provision Was Discretionary or Mandatory*

¶75 A particularly curious voter in 1988 might also have looked to this court's past precedent on the provision's meaning or even other states' caselaw. That curiosity would not have been rewarded. A voter would not have found anything definitive in our precedent and would have found mixed results from other states.

¶76 Before 1988, our precedent did not give a definitive answer on whether judges had discretion to grant bail to capital offenders or double felony defendants. We had never directly decided the question, but we had offered some observations on the topic. For example, in *Roll v. Larson*, we described the Bail Provision in somewhat permissive terms. 516 P.2d 1392 (Utah 1973). We said the provision "refers to a specific, distinct category identified as 'capital offenses' for which bail *may* be denied under certain circumstances." *Id.* at 1392 (emphasis added).

¶77 In *Scott v. Ryan*, on the other hand, we described the Bail Provision's operation in seemingly conflicting ways. 548 P.2d 235, 235–37 (Utah 1976). The majority opinion noted that the trial court's interpretation of the provision "denies bail to anyone arrested for another offense while on probation for a first offense, and denies a hearing for the purpose of determining whether the proof is evident or the presumption strong in the pending felony proceeding." *Id.* at 235–36. But Justice Crockett, in his concurrence, wrote about the provision in discretionary terms. "[I]f a person is either on probation or parole . . . and is thereafter accused of a felony, . . . there is no constitutional mandate that he must be granted bail. And it therefore *may be* denied." *Id.* at 237 (Crockett, J., concurring in part and dissenting in part) (emphasis added).

¶78   In *Chynoweth v. Larson*, we said that the Bail Provision "affirms the fundamental right to bail of one accused of a crime; and it does so in mandatory terms unless one of the exceptions exists." 572 P.2d 1081, 1082 (Utah 1977) (cleaned up). In other words, *Chynoweth* affirmed the mandatory nature of the right to bail and said that such a right was subject to exceptions but did not opine on whether a judge could grant bail to those subject to the exceptions. It is hard to imagine a voter in 1988 who explored these cases would come away sure that this court had decided whether a capital defendant or double felony defendant could be granted bail.[8]

¶79   If that curious and dedicated voter looked to other states in hopes of understanding what the amendment would do, the voter would find a decidedly mixed record. Some states specifically ruled that their similarly worded bail provisions left discretion to grant bail to those who fell into one of the exceptions. *See, e.g.*, *Harnish v. State*, 531 A.2d 1264, 1269 (Me. 1987) ("Finally, the State's showing of probable cause, while defeating a capital defendant's constitutional right to bail, leaves intact the discretionary power of the court to admit any defendant to bail."); *State v. Arthur*, 390 So. 2d 717, 718 (Fla. 1980) ("The constitutional provision does not require that bail release be denied to all persons charged with capital offenses . . . ."). Others ruled that denial of bail was mandatory. *See, e.g.*, *People v. Dist. Ct. In & For Adams Cnty.*, 529 P.2d 1335, 1336 (Colo. 1974) ("[W]e read 'all persons shall be bailable . . . except for capital offenses when the proof is evident or the presumption great' to mean and say that, when the

---

[8] The State supports its argument by referencing several cases from the Utah Territory: *Mead v. Metcalf*, 7 Utah 103, 25 P. 729 (Utah Terr. 1891), *overruled by Winnovich v. Emery*, 93 P. 988 (Utah 1908); *Ex parte Romanes*, 1 Utah 23 (Utah Terr. 1876); and *Ex parte Springer*, 1 Utah 214 (Utah Terr. 1875). These cases do not interpret the Utah Constitution, so although potentially helpful for explaining the historical context of the 1890s, they have little to do with how a voter in 1988 would understand the Bail Provision. The State also argues that a court of appeals case, *State v. Alvillar*, supports its reading of the provision. *See* 748 P.2d 207 (Utah Ct. App. 1988). In that case, the court, ruling on whether the defendant's inability to post bail violated the Equal Protection Clause, stated that the "defendant was precluded by statute and by the Utah Constitution—not by his economic circumstances—from having the opportunity to post bail." *Id.* We agree that *Alvillar* is a potential data point but we conclude that it is not a particularly potent one in light of this court's less definitive pronouncements.

proof is evident or the presumption great, denial of bail is mandatory.").

¶80   Taken together, the historical record before us strongly supports the conclusion that the original public meaning of the Bail Provision when the people of Utah ratified the 1988 amendment was that article I, section 8(1) guaranteed bail to all defendants, except for those who fell into the exceptions, but a court could still grant bail to those defendants in certain circumstances.

## III.   THE "HERMENEUTICAL AND PRACTICAL PROBLEMS" THAT THE STATE PERCEIVES WITH THE DISTRICT COURT'S INTERPRETATION OF THE BAIL PROVISION MAY BE ADDRESSED LEGISLATIVELY

¶81   The State argues that the district court's interpretation of the constitution was wrong because that interpretation allowed the court "to assume unrestrained discretion not to enforce the Constitution's double felony rule." The State says this "creates a number of hermeneutical and practical problems."[9]

¶82   The State claims that, among other problems, giving judges discretion would permit courts "to choose to never even enforce" the double felony defendant rule. And deciding when to grant bail would be "unfettered and unguided, not based on some known enumerated factors." This "directionless discretion" would lead to a lack of uniformity and allow courts to "discriminate among otherwise similarly situated double felony defendants," which would lead to a "real risk of unequal treatment among similarly situated double felony defendants." The State argues that even if a court is "willing to apply the rule," it could impose additional conditions on the State before it would withhold bail.

¶83   "[W]hen we interpret our constitution, we are not simply shopping for interpretations that we might like. We start our analysis by trying to understand what the language meant to those who voted on it, and we go from there." *Randolph v. State*, 2022 UT 34, ¶ 69, 515 P.3d 444. Even if we did conclude that the district court's interpretation of the Bail Provision could lead to the problems the State lists, it would still not be for us to choose the State's interpretation of the amendment over the one determined by plain language and original public meaning. Moreover, the State's concerns

_____

[9] Hermeneutics is "[t]he art of interpreting texts, esp. as a technique used in critical legal studies." *Hermeneutics*, *Black's Law Dictionary* (11th ed. 2019).

can be, and in some instances perhaps already have been, addressed legislatively. *See, e.g.*, UTAH CODE § 77-20-201 (2023).

## CONCLUSION

¶84   The district court correctly determined that it could grant Barnett bail. The Bail Provision's plain language, as well as the evidence of what a Utahn in 1988 would have understood the Bail provision to mean, supports the district court's interpretation of article I, section 8(1). We affirm.

———————————