*This opinion is subject to revision before final publication in the Pacific Reporter*

**2024 UT 40**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

LEAGUE OF WOMEN VOTERS OF UTAH, *et al.*,*
*Appellees,*

*v.*

UTAH STATE LEGISLATURE, *et al.*,*
*Appellants.*

No. 20240965
Heard September 25, 2024
Filed October 24, 2024

On Appeal of Interlocutory Order

Third Judicial District, Salt Lake County
The Honorable Dianna M. Gibson
No. 220901712

Attorneys*:

Troy L. Booher, J. Frederic Voros, Jr., Caroline A. Olsen,
David C. Reymann, Kade N. Olsen, Tammy Frisby, Salt Lake City,
Mark P. Gaber, Aseem Mulji, Benjamin Phillips, Washington,
D.C., Annabelle Harless, Chicago, Ill., for appellees

---

\* Additional Appellees: Mormon Women for Ethical
Government, Stefanie Condie, Malcolm Reid, Victoria Reid, Wendy
Martin, Eleanor Sundwall, Jack Markman, and Dale Cox.

Additional Appellants: Utah Legislative Redistricting
Committee, Senator Scott Sandall, Representative Mike Schultz,
and Senator J. Stuart Adams. Lieutenant Governor Deidre
Henderson is named as a defendant in this case but did not
participate in this appeal.

Additional attorneys for *amicus curiae*, in support of Appellants:
John J. Nielsen, Salt Lake City, for Utah Republican Party.

Victoria Ashby, Robert H. Rees, Eric N. Weeks, Michael Curtis, Tyler R. Green, Salt Lake City, Taylor A.R. Meehan, Frank H. Chang, Arlington, Va., for appellants

JUSTICE HAGEN authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE PETERSEN, and JUSTICE POHLMAN joined.

JUSTICE HAGEN, opinion of the Court:

## INTRODUCTION

¶1    When the people of Utah ratified our state constitution in 1895, they set out a particular process for amending that foundational document. Only the Legislature can propose a constitutional amendment, and only the voters can approve or reject it. Once two-thirds of both legislative houses vote in favor of a proposed amendment, "the Legislature shall cause the same to be published in at least one newspaper in every county of the state, where a newspaper is published, for two months immediately preceding the next general election, at which time the said amendment or amendments shall be submitted to the electors of the state for their approval or rejection." UTAH CONST. art. XXIII, § 1.

¶2    Until recently, statutes were in place to ensure that these constitutional requirements were fulfilled. But in 2023, the Legislature removed the statutory language directing the Lieutenant Governor to "publish the full text of the amendment . . . in at least one newspaper in every county of the state where a newspaper is published." *See* UTAH CODE § 20A-7-103(2) (2022). And earlier this year, the duty of drafting the ballot language to be "submitted" to voters was reassigned from non-partisan legislative staff attorneys to the leadership of both houses. *See id.* § 20A-7-103(3)(c) (2024).

¶3    On August 21, 2024, the Legislature called an emergency special session and passed a statute adopting abbreviated timelines to allow the Legislature to include an additional constitutional amendment on this year's general election ballot. The Legislature availed itself of those timelines to pass a resolution proposing Amendment D. If approved by voters, Amendment D would change the constitution in three ways: (1) it would specify that the

people's right to alter or reform their government can be exercised only in the manner provided by the constitution—namely, through the constitutional amendment process and the citizen initiative and referendum processes; (2) it would ban foreign influence in the initiative and referendum processes; and (3) it would give the Legislature unlimited power to amend or repeal any law passed by a citizen initiative, including those that reform the government. It is the third change that is at the heart of this case.

¶4 The proposed amendment was not published in newspapers as required by the constitution but was instead posted to a public notice website. And the President of the Senate and the Speaker of the House drafted the ballot title to be submitted to the voters. Relevant to this appeal, the ballot title advised voters that Amendment D would "strengthen the initiative process by . . . [c]larifying the voters and legislative bodies' ability to amend laws." It also advised voters that, if the amendment was approved, "state law would also be changed to . . . [e]stablish requirements for the legislature to follow the intent of a ballot initiative."

¶5 The emergency special session proposing Amendment D was prompted by this court's decision in *League of Women Voters of Utah v. Utah State Legislature* (*League of Women Voters I*), 2024 UT 21, 554 P.3d 872. In that case, we recognized that the people of Utah have always had a fundamental constitutional right to alter or reform their government as the public welfare requires. *Id.* ¶ 111. Since 1900, our constitution has allowed the people to exercise that right by passing initiatives to achieve desired governmental reforms. *Id.* ¶¶ 10, 138. The Legislature cannot unduly impair those reforms without infringing the people's fundamental right to alter and reform their government. *Id.* ¶ 11.

¶6 The Legislature is not, however, powerless to amend such laws passed by initiative. The Utah Constitution imposes no restriction on the Legislature's power to make whatever changes are needed to carry out the intended government reform. *Id.* There is no constitutional impediment to refining the law in a way that promotes the reform because such refinements do not infringe on the people's right to alter or reform their government. *Id.*

¶7 On the other hand, the Legislature cannot undermine the will of the voters by impairing the reform unless such action is narrowly tailored to achieve a compelling governmental interest. This standard "avoid[s] tying the Legislature's hands while still protecting fundamental rights." *Id.* ¶ 217.

¶8 Amendment D would alter that balance and give the Legislature unfettered constitutional authority to amend or repeal any initiative, including those that reform the government. But the ballot title does not disclose this fundamental change. To the contrary, the ballot title tells voters, in part, that Amendment D will strengthen the initiative process by clarifying the voters' and the Legislature's ability to amend laws. In truth, Amendment D has no effect on the voters' ability to amend laws; it speaks only to the Legislature's ability to amend laws passed by initiative. And Amendment D does not clarify the Legislature's ability to do so; the amendment changes it by removing existing constitutional restraints on the Legislature's power. Although one could argue that this change strengthens the overall legislative process, there is no support for the assertion that it strengthens the initiative process itself. Because the ballot language does not accurately reflect the substance of the amendment, Amendment D has not been submitted to the voters in the way the constitution requires.

¶9 Additionally, the Legislature did not cause the amendment to be published as mandated by the constitution. The drafters of our constitution and the people who ratified it determined that the appropriate way to ensure that voters understood a proposed amendment was continuous publication of its full text in at least one newspaper in each county for two months prior to the election. *See* UTAH CONST. art. XXIII, § 1. They also deemed it necessary to enshrine that precise method in the constitution. We are not at liberty to second-guess the wisdom of this approach, nor is the Legislature at liberty to change it by statute. Even accepting the Legislature's argument in this case that "newspaper" includes online or other electronic versions, posting a public notice on a government website does not meet our constitution's express requirements. Because the Legislature did not comply with the Publication Clause, the amendment cannot be submitted to the voters in accordance with our constitution.

¶10 The district court correctly ruled that the Legislature had not satisfied the constitutional prerequisites for putting Amendment D to a popular vote. The district court also acted within its discretion in finding that the equities favored a preliminary injunction declaring Amendment D void and ordering that any votes cast not be counted. Although the voters should have the opportunity to decide whether the balance between the people's direct legislative power and that of their elected representatives should be changed, the public interest requires that

4

constitutional amendments be submitted to voters in the way mandated by our constitution. Accordingly, we affirm.

## BACKGROUND

*A. Our Decision in* League of Women Voters I

¶11   On July 11, 2024, we issued our decision in *League of Women Voters I*, 2024 UT 21, 554 P.3d 872. The case arose from a citizen initiative Utahns passed in 2018 called "Better Boundaries" or "Proposition 4." *Id.* ¶¶ 24–25. "Proposition 4 sought to reform the process of drawing Utah's electoral districts (redistricting) by prohibiting a practice called 'partisan gerrymandering,'" *id.* ¶ 5, which generally "refers to efforts by incumbent politicians to draw district boundaries that benefit themselves and their political party, by diluting the votes of citizens they disfavor because they predict those citizens will vote for candidates of other parties," *id.* ¶ 20. To achieve its goal, Proposition 4 created an independent commission tasked with drawing new boundaries and submitting those maps to the Legislature for approval. *Id.* ¶¶ 30–31. The Legislature could reject the commission's recommendations and adopt its own map so long as the Legislature provided "reasons for rejecting" the recommendation and explained how its own map better satisfied Proposition 4's "neutral redistricting standards," which prohibited partisan gerrymandering. *Id.* ¶ 32 (cleaned up).

¶12   But before the next redistricting cycle, the Legislature enacted Senate Bill 200, which replaced the statutes enacted by Proposition 4. *Id.* ¶ 34. Notably, S.B. 200 did not include a ban on partisan gerrymandering. *See id.* While an independent commission could still propose maps in accordance with Proposition 4's neutral redistricting criteria, the Legislature was not bound by those criteria and could reject the commission's maps and adopt its own without explanation. *Id.*

¶13   After receiving the results of the 2020 census and holding numerous public hearings, the independent commission submitted three proposed redistricting maps to the Legislature. *Id.* ¶¶ 36, 39–40. The Legislature rejected these maps and instead moved forward with its own maps, which Plaintiffs claim are the result of partisan gerrymandering. *Id.* ¶ 41.

¶14   Plaintiffs filed a complaint in district court alleging various constitutional violations. *Id.* ¶¶ 48–49. Count V of the complaint challenged the Legislature's repeal of Proposition 4 by asserting that when Utah voters enacted Proposition 4, they exercised their

constitutionally protected rights under the Initiative Provision and Alter or Reform Clause of the Utah Constitution. *Id.* ¶ 49. Although the district court allowed the lawsuit to proceed on Plaintiffs' other constitutional claims, it dismissed Count V. *Id.* ¶ 51. We granted cross-petitions from the parties for interlocutory appeal of the district court's decision. *Id.* ¶ 57.

¶15 On appeal, Plaintiffs argued, in part, that the Utah Constitution prevented the Legislature from undoing any law passed by initiative. In the alternative, Plaintiffs argued that, at the very least, the Utah Constitution constrained the Legislature's ability to repeal government reforms passed by initiative.

¶16 We decided the case on Plaintiffs' narrower, alternative argument. We recognized that article I, section 2 of our constitution gives Utahns a fundamental right to "alter or reform their government as the public welfare may require." *Id.* ¶ 8 (cleaned up). Although that right must be exercised in accordance with our constitution, article VI gives the people the power to directly legislate by passing citizen initiatives and referendums. *Id.* ¶¶ 9–10.

¶17 Construing both constitutional provisions in harmony, we held that "when Utahns exercise their right to reform the government through a citizen initiative, their exercise of these rights is protected from government infringement." *Id.* ¶ 11. We reversed the dismissal of Count V because the claim was not defeated as a matter of law by the Legislature's "general legislative power to amend, repeal, and enact statutes." *Id.* ¶¶ 12–13.

¶18 Our holding was a narrow one. It applies only when the people pass an initiative that contains a government reform and the Legislature subsequently passes legislation that impairs that reform. *See id.* ¶ 74. Because the Legislature did not contest Plaintiffs' assertion that the initiative at issue contained a government reform and because the parties offered no briefing on that question, we did not define the parameters of a government-reform initiative. *See, e.g.*, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 348 (2022) (Roberts, C.J., concurring in the judgment) ("If it is not necessary to decide more to dispose of a case, then it is necessary *not* to decide more.").

¶19 We also explained that the Legislature retains the ability to amend government-reform initiatives so long as it "does not infringe the people's reform right—for example, if the amendment furthered or facilitated the reform, or at least did not impair it."

*League of Women Voters I*, 2024 UT 21, ¶ 162. And even if the Legislature makes changes that do impair the reform, "those changes would not be unconstitutional if the Legislature showed they were narrowly tailored to protect a compelling governmental interest." *Id.* (cleaned up).

¶20 We offered no opinion on whether Plaintiffs would ultimately succeed on Count V. Because the district court dismissed that claim at the pleading stage, the parties had not yet had a chance to litigate the merits. We explained that Plaintiffs still have the burden to show that (1) Proposition 4 contained a government reform, and (2) S.B. 200 impaired that reform. *Id.* ¶¶ 200–01. "If Plaintiffs make this showing, then the burden will shift to Defendants, who will have an opportunity to establish that S.B. 200 is not unconstitutional because it satisfies strict scrutiny." *Id.* ¶ 202.

### B. *The Legislature's Response to* League of Women Voters I

¶21 On August 21, 2024, the Legislature convened a special session to address "emergencies in the affairs of the state." Utah State Legislature, *Legislative Special Session Proclamation*, https://le.utah.gov/session/2024S4/proclamation.pdf (last visited Oct. 22, 2024). In the proclamation announcing the special session, legislative leaders cited "the Utah Supreme Court's recent decision upending over 100 years of representative democracy in Utah without the voice of the people, leaving the state vulnerable to laws advanced by foreign interests through ballot propositions." *Id.*

#### 1. Enabling Legislation

¶22 During the special session, the Legislature passed Senate Bill 4002, which created Utah Code section 20A-7-103.1. *See* Ballot Proposition Amendments, S.B. 4002, 2024 Leg., 4th Spec. Sess. (Utah 2024). The new statute expedited the process for the Legislature to propose a constitutional amendment and applied only during the one-month period between August 1 and September 1, 2024. *See* UTAH CODE § 20A-7-103.1. In addition to extending certain deadlines, the statute suspended the normal procedures for preparing arguments for and against the constitutional amendment for the voter information pamphlet. *Id.* Under the new statute, the presiding officer of the house in which the amendment originated would appoint legislators to draft the arguments in favor of and against the amendment. *Id.* § 20A-7-103.1(5).

¶23   The process for preparing the voter information pamphlet had already been changed earlier in the year. The prior law tasked the Office of Legislative Research and General Counsel with drafting an "impartial analysis" of proposed constitutional amendments to be included in the voter information pamphlet. *Id.* § 20A-7-702(7)(c) (2023). During the 2024 general session, the Legislature reassigned the duty to draft the analysis to the President of the Senate and the Speaker of the House, without requiring that the "analysis of the measure" be impartial. Election Law Revisions, S.B. 37 § 10, 2024 Leg., Gen. Sess. (Utah 2024) (codified at UTAH CODE § 20A-7-702(7)(c)).

### 2.   Amendment D

¶24   After passing section 20A-7-103.1, the Legislature adopted Senate Joint Resolution 401, which proposed an amendment to the Utah Constitution that would later be designated as Amendment D. *See* Proposal to Amend Utah Constitution – Voter Legislative Power, S.J.R. 401, 2024 Leg., 4th Spec. Sess. (Utah 2024). According to the joint resolution, Amendment D would "amend the Utah Constitution to modify provisions relating to voter powers." *See id.* More specifically, the joint resolution listed four objectives that Amendment D would accomplish:

- "provide the scope of the people's powers to alter or reform government,"

- "prohibit foreign individuals, entities, and governments from influencing, supporting, or opposing an initiative or a referendum,"

- "authorize the Legislature to provide for enforcement of the prohibition by statute," and

- "provide the circumstances for amendment, enactment, or repeal of law passed, adopted, or rejected by the voters."

*Id.*

¶25   The first objective would be accomplished by adding the following underlined language to article I, section 2:

> All political power is inherent in the people; and all free governments are founded on their authority for their equal protection and benefit, and they have the right to alter or reform their government <u>through the processes established in Article VI, Section 1,</u>

8

Subsection (2), or through Article XXIII as the public welfare may require.

*Id.* The added language specifies that the people's right to alter or reform the government can be exercised only as provided by the constitution. Specifically, as set forth in article VI, section 1, subsection (2), the people may alter or reform the government through the initiative and referendum processes. Alternatively, they may alter or reform the government by amending the Utah Constitution as provided in article XXIII, section 1.

¶26 The second and third objectives would be accomplished by adding the following underlined language as a new third subsection to article VI, section 1:

(1) The Legislative power of the State shall be vested in:

(a) a Senate and House of Representatives which shall be designated the Legislature of the State of Utah; and

(b) the people of the State of Utah as provided in Subsection (2).

(2) (a) (i) The legal voters of the State of Utah, in the numbers, under the conditions, in the manner, and within the time provided by statute, may:

(A) initiate any desired legislation and cause it to be submitted to the people for adoption upon a majority vote of those voting on the legislation, as provided by statute; or

(B) require any law passed by the Legislature, except those laws passed by a two-thirds vote of the members elected to each house of the Legislature, to be submitted to the voters of the State, as provided by statute, before the law may take effect.

(ii) Notwithstanding Subsection (2)(a)(i)(A), legislation initiated to allow, limit, or prohibit the taking of wildlife or the season for or method of taking wildlife shall be adopted upon approval of two-thirds of those voting.

(b) The legal voters of any county, city, or town, in the numbers, under the conditions, in the manner, and within the time provided by statute, may:

9

(i) initiate any desired legislation and cause it to be submitted to the people of the county, city, or town for adoption upon a majority vote of those voting on the legislation, as provided by statute; or

(ii) require any law or ordinance passed by the law making body of the county, city, or town to be submitted to the voters thereof, as provided by statute, before the law or ordinance may take effect.

(3) (a) Foreign individuals, entities, or governments may not, directly or indirectly, influence, support, or oppose an initiative or a referendum.

   (b) The Legislature may provide, by statute, definitions, scope, and enforcement of the prohibition under Subsection (3)(a).

*Id.* The new subsection would prohibit "foreign" involvement in the initiative and referendum processes and would allow the Legislature to define the meaning of the provision and to provide a statutory enforcement mechanism. *Id.*

¶27 The fourth objective would be accomplished by adding an additional subsection to article VI, section 1 as follows:

(4) Notwithstanding any other provision of this Constitution, the people's exercise of their Legislative power as provided in Subsection (2) does not limit or preclude the exercise of Legislative power, including through amending, enacting, or repealing a law, by the Legislature, or by a law making body of a county, city, or town, on behalf of the people whom they are elected to represent.

*Id.* As summarized in the resolution, this provision "provide[s] the circumstances for [legislative] amendment, enactment, or repeal of [a] law passed, adopted, or rejected by the voters." *Id.*

¶28 The resolution directed the Lieutenant Governor to submit the proposed amendment to Utah voters "at the next regular general election in the manner provided by law." *Id.* If approved by a majority of voters, the amendment would take effect on January 1, 2025. *Id.* The resolution also provided that, except with respect to the foreign influence provision, the amendment would "have retrospective operation." *Id.*

### 3. The Contingent Legislation

¶29 The Legislature also enacted Senate Bill 4003, which would change several statutes addressing statewide initiatives and referendums but would go into effect only if the voters approved Amendment D. Statewide Initiative and Referendum Amendments, S.B. 4003, 2024 Leg., 4th Spec. Sess. (Utah 2024). Among other changes, S.B. 4003 would extend referendum deadlines. *Id.* § 1. The legislation would also make the following change to Utah Code section 20A-7-212(3)(b):

> (3)~~(b) The Legislature may amend any initiative approved by the people at any legislative session.~~
>
> (b) <u>If, during the general session next following the passage of a law submitted to the people by initiative petition, the Legislature amends the law, the Legislature:</u>
>
>> (i) <u>shall give deference to the initiative by amending the law in a manner that, in the Legislature's determination, leaves intact the general purpose of the initiative; and</u>
>>
>> (ii) <u>notwithstanding Subsection (3)(b)(i), may amend the law in any manner determined necessary by the Legislature to mitigate an adverse fiscal impact of the initiative.</u>

*Id.* § 2.

¶30 On August 22, 2024, the Governor signed both bills. *2024 Fourth Special Session Bills Passed*, UTAH STATE LEGISLATURE, https://le.utah.gov/asp/passedbills/passedbills.asp?session=2024S4 (last visited Oct. 22, 2024).

### 4. The Ballot Language

¶31 During the 2024 general session, the Legislature reassigned the task of drafting and designating a ballot title for constitutional amendments from the Legislature's general counsel to the Senate President and Speaker of the House. Election Law Revisions, S.B. 37 § 8, 2024 Leg., Gen. Sess. (Utah 2024). Those presiding officers must "draft and designate a ballot title for each proposed amendment" that "summarizes the subject matter of the amendment" and "summarizes any legislation that is enacted and will become effective upon the voters' adoption of the proposed constitutional amendment." UTAH CODE § 20A-7-103(3)(c).

¶32 On September 3, the Lieutenant Governor certified the following ballot title drafted by the presiding officers:

**Constitutional Amendment D**

*Should the Utah Constitution be changed to strengthen the initiative process by:*

- Prohibiting foreign influence on ballot initiatives and referendums.

- Clarifying the voters and legislative bodies' ability to amend laws.

*If approved, state law would also be changed to:*

- Allow Utah citizens 50% more time to gather signatures for a statewide referendum.

- Establish requirements for the legislature to follow the intent of a ballot initiative.

For ( ) Against ( )

Office of the Lieutenant Governor, *2024 General Election Certification* [hereinafter *General Election Certification*] at 34–35, https://vote.utah.gov/wp-content/uploads/sites/42/2024/09/2024-Official-General-Election-Certification.pdf.

5. The Publication Requirement

¶33 The Utah Constitution states that "the Legislature shall cause [a proposed amendment] to be published in at least one newspaper in every county of the state, where a newspaper is published, for two months immediately preceding the next general election." UTAH CONST. art. XXIII, § 1.

¶34 At present, there is no correlating requirement in the Utah Code. But prior to 2002, the Legislature delegated the publication responsibility to the Lieutenant Governor in a statute that tracked the constitutional language. Specifically, the statute provided that "[t]he lieutenant governor shall, not later than 60 days before the regular general election, publish the full text of the amendment . . . in at least one newspaper in every county of the state where a newspaper is published." UTAH CODE § 20A-7-103(2) (1995). In 2002, the statute was amended to no longer require publication for sixty days. *See id.* § 20A-7-103(2) (2002) (changing the timeframe to "not more than 60 days or less than ten days"); *see also id.* § 20A-7-103(2) (2008) (changing the timeframe to "not more than 60 days or less than 14 days").

¶35 Then, in 2023, the Legislature removed the statutory requirement that the amendment be published "in at least one newspaper in every county of the state where a newspaper is published." *Id.* § 20A-7-103(2) (2023). The statute now requires the Lieutenant Governor to "publish the full text of the amendment . . . as a class A notice" "not more than 60 days or less than 14 days before the date of the election . . . through the date of the election." *Id.* § 20A-7-103(2) (2023). Class A notices are published to various government websites. *See id.* § 63G-30-102(1).

¶36 On September 9, the Lieutenant Governor published Amendment D's text on Utah's public notice website, and it has been there continuously ever since. *2024 Proposed Constitutional Amendments*, PUBLIC NOTICE WEBSITE, https://www.utah.gov/pmn/sitemap/notice/938513.html (last visited Oct. 22, 2024). The text is also available on the Legislature's and Lieutenant Governor's websites. *See* Proposal to Amend Utah Constitution – Voter Legislative Power, S.J.R. 401, 2024 Leg., 4th Spec. Sess. (Utah 2024) (available at https://le.utah.gov/~2024s4/bills/static/SJR401.html); *Public Notice – Full Text of Proposed Constitutional Amendments*, UTAH LIEUTENANT GOVERNOR DEIDRE HENDERSON, https://ltgovernor.utah.gov/2024/09/09/public-notice-full-text-of-proposed-constitutional-amendments/ (last visited Oct. 22, 2024).

¶37 Amendment D has received media attention since the special session. Some articles have included portions of Amendment D's text, and at least one has included a link to the amendment's full text. But neither side in this dispute has pointed us to any article that includes the entirety of Amendment D.

¶38 After Plaintiffs sought a preliminary injunction for failure to comply with the publication requirement, the Legislature purchased advertising space for the full text of Amendment D in thirty-five newspapers across Utah "during the week of September 16." These ads occurred in a mix of print and online-only publications. Since then, the full text of Amendment D has been available on the Utah Press Association's website.

*C. Proceedings Below*

1. Submission Clause Claims

¶39 On September 5, one day after the Lieutenant Governor published Amendment D's ballot language on government websites, Plaintiffs sought leave from the district court to file a

supplemental complaint. Relevant to this appeal, Plaintiffs alleged that Amendment D's ballot title violates the Submission Clause in article XXIII, section 1, which states that any constitutional amendment proposed by the Legislature "shall be submitted to the electors of the state for their approval or rejection, and if a majority of the electors voting thereon shall approve the same," the amendment "shall become part of [the Utah] Constitution." UTAH CONST. art XXIII, § 1. Plaintiffs alleged that Amendment D was not "submitted" to the voters because the ballot language is "misleading, deceptive, inaccurate, biased," and provided an "unreasonable representation" of what Amendment D would accomplish. Specifically, Plaintiffs noted that the ballot language says nothing about how Amendment D "would eliminate a fundamental constitutional right . . . to alter or reform the government without legislative interference." They alleged that the ballot language "deceives voters into believing that a vote in favor of . . . Amendment [D] will strengthen their constitutional right to legislate by initiative" when the purpose of Amendment D "is to weaken voters' constitutional right to reform the government by ballot initiative by authorizing the Legislature to amend or repeal them without limitation."

¶40   In conjunction with the supplemental complaint, Plaintiffs filed a motion for preliminary injunction asking the district court (1) to enjoin Defendants from including Amendment D on the November 2024 ballot, and (2) if any ballots were issued that included Amendment D, to declare that amendment void.

¶41   The Lieutenant Governor responded to the motion for a preliminary injunction by explaining that, to comply with federal election law, county clerks are required to "submit ballot proofs to third-party printing vendors beginning Monday, September 9, 2024" to meet a September 21 mailing deadline for overseas ballots. If reprinting the ballots was even possible, the Lieutenant Governor estimated that the cost would be "up to $3 million." The Lieutenant Governor took "no position on the merits of Plaintiffs' proposed supplemental claims or their likelihood of success."

2.   Publication Clause Claims

¶42  On September 7, one day after the 60-day pre-election window began, Plaintiffs again sought leave from the district court to file a second supplemental complaint. The second supplemental complaint included a single cause of action arguing that Amendment D was submitted to the voters in an unconstitutional

manner because the Legislature failed to comply with the Publication Clause of the Utah Constitution. UTAH CONST. art. XXIII, § 1. Plaintiffs contended that the Legislature never caused Amendment D "'to be published in at least one newspaper in every county of the state where a newspaper is published for two months immediately preceding' the 2024 General Election on November 5, 2024." (Quoting *id.*)

¶43 Plaintiffs also filed a second motion for a preliminary injunction to prevent Amendment D from being placed on the ballot. In response to the Lieutenant Governor's arguments about time constraints, Plaintiffs responded that "[r]egardless of whether time permits the removal of Amendment D from the physical ballots (it does), Plaintiffs are entitled to an injunction voiding Amendment D such that it will have no effect."

¶44 During a scheduling conference on September 9, counsel for the Lieutenant Governor stated that "the absolute drop-dead date for getting proofs to the printer" was September 12. Due to these time constraints, the district court expedited the briefing deadlines and scheduled a hearing for September 11.

### 3. The Legislature's Response

¶45 On the morning of September 11, the Legislature filed its opposition to the preliminary injunction motions. The Legislature asked the district court to keep Amendment D on the ballot, arguing that its removal "would inject confusion and potential catastrophic errors into the nearly final ballot-printing process." Relying on *In re Cook*, 882 P.2d 656 (Utah 1994), the Legislature first argued that the motions must be denied because an order to remove Amendment D from the ballot would risk causing a "serious disruption" to the election process. *Id.* at 659 (cleaned up). The Legislature contended that these disruptions would occur because ballots had already been certified, proofs had gone out, reprinting would cost up to $3 million, and any changes could jeopardize the State's ability to meet federal deadlines.

¶46 The Legislature also argued that Plaintiffs could not show that they were likely to succeed on the merits, as required to obtain a preliminary injunction. *See* UTAH R. CIV. P. 65A(e)(1). Regarding Plaintiffs' Submission Clause claims, the Legislature contended that the ballot language is not misleading and will not cause voter confusion given that Amendment D's text "is widely available now and its effect will continue to be debated in the press and in forthcoming Voter Information Pamphlets." The Legislature

further asserted that Plaintiffs' "desire to line-edit the Amendment D summary is not a [justiciable] dispute to be resolved by courts."

¶47 Concerning Plaintiffs' Publication Clause claims, the Legislature argued that the constitution's use of the term "newspaper" was not limited to physical newspapers and that newspapers with a general circulation, whether online or print, had published stories about Amendment D, including some of its text or links to the full text. In the Legislature's view, this was enough to satisfy the Publication Clause's requirements. The Legislature also argued that, to establish a violation of the Publication Clause, Plaintiffs needed to show that the Legislature had failed to "cause" Amendment D to be published. And the Legislature asserted that it had caused the publication of Amendment D by making the text publicly available on government websites for newspapers to publish.

¶48 Lastly, the Legislature argued that the district court "must refuse Plaintiffs' request to declare Amendment D votes 'void' because the balance of the equities and public interest weigh[]s strongly against that extraordinary remedy."

¶49 That same afternoon, the district court held a hearing on Plaintiffs' motions. The parties emphasized the need for a speedy decision given the printing time constraints.

4. The District Court's Order

¶50 On the following morning, September 12, the district court issued an order granting Plaintiffs' motions. The court determined there was a substantial likelihood that Plaintiffs would succeed on the merits of their claims. It identified two constitutional violations relevant to this appeal.

¶51 First, the court ruled that Amendment D had not been "submitted" to the voters as required by the Submission Clause because the ballot title mischaracterized the proposed amendment. *See* UTAH CONST. art. XXIII, § 1. The court reasoned that Amendment D's ballot title does not provide a fair and accurate summary of "the issue to be decided to assure a 'free, intelligent and informed vote by the average citizen.'" (Quoting *State ex rel. Voters First v. Ohio Ballot Bd.*, 978 N.E.2d 119, 126 (Ohio 2012).) Instead, the court agreed with Plaintiffs that the ballot title "both amplifies by using 'strengthen' and simultaneously omits the material and consequential constitutional change"—that "the Legislature will have the unlimited right to change law passed by

citizen initiative." The court continued that Amendment D "does *strengthen* and *clarif[y]* the *Legislature's* power to change laws passed by citizen initiative for any reason, but at the expense of the people's Legislative power."

¶52 Second, the district court ruled that Amendment D was not published as required by the Publication Clause. The court rejected the Legislature's argument that it had complied with the Publication Clause by posting Amendment D on government websites for the media to publish as it saw fit. The court emphasized that it could not "ignore the explicit requirement" that the Legislature "publish the full text of Amendment D in a 'newspaper' for at least two months prior to the November 5, 2024 general election." The court did not see how it "could interpret 'newspaper' to mean an 'online website'" or excuse the violation based on substantial compliance. Despite numerous news articles about Amendment D, the court determined that no evidence had been presented that the Legislature "caused" Amendment D "to appear in any newspaper in Utah."

¶53 After analyzing the constitutional provisions, the district court concluded that a preliminary injunction was appropriate because Plaintiffs would suffer irreparable harm from "inaccurate ballot language" causing Utahns to "unwittingly *eliminate* a fundamental constitutional right that has existed since 1895." Balancing the equities, the court reasoned that the harm caused by omitting "the impact on Utah citizens' fundamental constitutional rights" while "appear[ing] to represent to the people that it *strengthens* rights, outweighs any harm Defendants may suffer if the requested injunction is granted." The court noted that the Legislature was "somewhat responsible for the impact on ballot printing" because it "truncated the deadlines, sidestepped normal processes, and proposed" Amendment D with a description that was "inaccurate." The court further concluded that granting the injunction would promote the public interest because Utahns "are entitled to an accurate summary of any proposed constitutional amendment that impacts their fundamental rights" and to the constitutionally required notice in newspapers two months prior to the election.

¶54 Based on those findings, the district court granted Plaintiffs' motions for a preliminary injunction. The court allowed the ballots to be printed as certified but directed the Lieutenant Governor to ensure that votes for and against Amendment D not

be counted because "Amendment D is void and shall be given no effect."

### 5. The Present Appeal

¶55   The next day, September 13, the Legislature petitioned this court for permission to appeal the district court's ruling granting the preliminary injunction. The Legislature also filed a rule 23C motion for expedited consideration of the petition due to the tight deadlines of the election process. *See* UTAH R. APP. P. 23C(a). The Legislature argued that "[t]he weeks immediately preceding Election Day are irreplaceable moments in an election cycle" because "voters will begin or continue to educate themselves on the candidates and issues on the ballot," and "[p]roponents and opponents of a host of candidates and issues will engage in First Amendment protected activity to persuade their fellow citizens how to vote." The Legislature continued that the "uncertainty" of the state of Amendment D gives the amendment's proponents "no reason to speak in support of it, raise money for it, or persuade their fellow citizens to support it if their votes will not count."

¶56   We granted the Legislature's petition for interlocutory review on September 14. We also ordered expedited briefing on the merits to be completed by September 23.

¶57   On September 25, we heard oral argument. We issued an order that same day affirming the district court's ruling with a published opinion to follow. We now detail our reasons for upholding the preliminary injunction.

## ISSUE AND STANDARDS OF REVIEW

¶58   The Legislature challenges the district court's order granting Plaintiffs' request for a preliminary injunction. We review a district court's decision to issue a preliminary injunction "for an abuse of discretion," and we will allow an injunction to stand unless the district court's decision "is so lacking in support as to be against the clear weight of the evidence." *Planned Parenthood Ass'n of Utah v. State*, 2024 UT 28, ¶ 43, 554 P.3d 998 (cleaned up). But we review "for correctness" any legal conclusions that are embedded in the district court's decision. *Id.* ¶ 44.

## ANALYSIS

¶59   Plaintiffs moved for a preliminary injunction that would either remove Amendment D from the ballot or keep the amendment on the ballot but declare it void. Taking the latter

approach, the district court declared Amendment D void, ordered that the amendment "be given no effect," and instructed the Lieutenant Governor to ensure that any votes cast on the amendment not be counted. We now review the district court's decision.

¶60   Before turning to the district court's analysis, however, we briefly address the first sentence of the Legislature's petition: "People decide elections; courts don't." We emphatically agree with the Legislature that "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." (Quoting *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).) And we also agree that the judicial branch must be cautious when parties bring their election disputes to the courts. But democratic elections and judicial power are complementary, not contradictory.

¶61   Under the Utah Constitution, judicial power is vested in the courts, UTAH CONST. art. VIII, § 1, and this court has the "power to issue all writs and orders necessary for . . . the complete determination of any cause," *id.* art. VIII, § 3. With that power comes the responsibility "to interpret, construe, expound, and apply" the constitution. *Holden v. Hardy*, 46 P. 756, 760 (Utah 1896). The Legislature, too, has given Utah courts jurisdiction to hear election-related matters. The Election Code is replete with examples.[1] And the Legislature has given this court exclusive

---

[1]  *See, e.g.*, UTAH CODE § 20A-7-307(5)(a) ("If the lieutenant governor refuses to declare a referendum petition sufficient that a voter believes is legally sufficient, the voter may . . . apply to the appropriate court for an order finding the referendum petition legally sufficient."); *id.* § 20A-7-308(4)(a)(i) ("At least three of the sponsors of [a] referendum petition may . . . challenge the wording of the short title and summary prepared by the Office of Legislative Research and General Counsel to the appropriate court."); *id.* § 20A-4-402(1) ("The election or nomination of any person to any public office, and the declared result of the vote on any ballot proposition or bond proposition submitted to a vote of the people may be contested according to the procedures established in [Part 4 of the Election Code] . . . ."); *id.* § 20A-4-403(1)(a) ("In contesting the results of all elections, except for primary elections and bond elections, a registered voter may contest the right of an individual declared elected to office by filing a verified written complaint with

(continued . . .)

appellate jurisdiction over "election and voting contests." UTAH CODE § 78A-3-102(4)(b). In reviewing the district court's decision here, we are not deciding an election; we are fulfilling our constitutional duty to resolve a legal dispute that has been properly raised in the courts.

¶62 To prevail in this appeal, the Legislature must demonstrate that the district court abused its discretion in finding that Plaintiffs met the standard for a preliminary injunction. Under that standard, Plaintiffs were required to show that (1) they are substantially likely to "prevail on the merits" of their underlying claim, (2) they would "suffer irreparable harm unless" the injunction issues, (3) their threatened injury "outweighs whatever damage the . . . injunction may cause the party restrained or enjoined," and (4) the injunction "would not be adverse to the public interest." UTAH R. CIV. P. 65A(e).

---

the district court . . . ."); *id.* § 20A-1-403(2)(a)(i) (authorizing "a candidate or the candidate's agent" to "file . . . a petition for ballot correction with the district court"); *id.* § 20A-1-404(1)(a)(i) ("Whenever any controversy occurs between any election officer or other person or entity charged with any duty or function under [the Election Code] and any candidate, or the officers or representatives of any political party, or persons who have made nominations, either party to the controversy may file a verified petition with the district court . . . ."); *id.* § 20A-5-405(4)(a) ("If the election officer refuses or fails to correct an error or omission in a ballot, a candidate or a candidate's agent may file a verified petition with the district court."); *id.* § 20A-7-502.7(4) (explaining that "[i]f a county, city, or town rejects a proposed initiative, a sponsor of the proposed initiative may . . . appeal the decision to" the courts); *id.* § 20A-7-508(6)(a) ("If the short title or summary . . . is unsatisfactory or does not comply with the requirements of this section, the decision of the local attorney may be appealed to the appropriate court . . . ."); *id.* § 20A-7-607(5)(a) ("If the local clerk refuses to declare a referendum petition sufficient, any voter may . . . apply to the appropriate court for an order finding the referendum petition legally sufficient."); *id.* § 20A-1-804(1)(a) (empowering courts to—where certain candidates for office have "committed a significant violation" of the Election Code— "declar[e] void the election" of the candidate, oust and exclude the candidate from office, and declare the office vacant).

¶63 We conclude that the district court acted within its discretion in finding that Plaintiffs met the preliminary injunction standard. Specifically, the district court did not err in finding that Plaintiffs are substantially likely to prevail on the merits of their claims under article XXIII, section 1 of the Utah Constitution, and that the remaining preliminary-injunction factors weigh in Plaintiffs' favor. We begin with an analysis of Plaintiffs' constitutional claims and then turn to the other factors.

I. THE DISTRICT COURT CORRECTLY INTERPRETED AND APPLIED THE SUBMISSION AND PUBLICATION CLAUSES AND ACTED WITHIN ITS DISCRETION IN FINDING THAT PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THOSE CLAIMS

¶64 Article XXIII, section 1 of the Utah Constitution prescribes a specific, step-by-step process for amending the state constitution.[2] The process commences when one of the two legislative houses proposes an amendment. UTAH CONST. art. XXIII, § 1. If two-thirds of the members elected to each house vote in favor, the proposed amendment and the votes thereon are recorded on the legislative journals. *Id.* The Publication Clause then requires the Legislature to "cause the [proposed amendment] to be published in at least one newspaper in every county of the state, where a newspaper is published, for two months immediately preceding the next general election." *Id.* Once the Legislature fulfills this newspaper-publication requirement, the Submission Clause requires "the said amendment" to "be submitted to the electors of the state for their approval or rejection." *Id.* Finally, the amendment "become[s] part of [the] Constitution" if a majority of the voters approve it. *Id.*

¶65 Plaintiffs argue that the process the Legislature followed for Amendment D deviated from these constitutional requirements in two ways. First, Plaintiffs assert that Amendment D has not been submitted to the voters as required by the Submission Clause because the ballot title is misleading and deprives voters of the chance to express their will on the substance of the proposal. Second, they maintain that the Legislature did not cause the proposed amendment to be published in newspapers throughout

---

[2] Section 2 of article XXIII also provides a process for amending the constitution by convention, but that section is not at issue. UTAH CONST. art. XXIII, § 2.

the state for two months leading up to the election as required by the Publication Clause. We agree on both points.

### A. Amendment D Was Not "Submitted" to the Voters as the Utah Constitution Requires

¶66 In granting the preliminary injunction, the district court first ruled that Plaintiffs had shown a substantial likelihood of success on the merits of their Submission Clause claim. Because this case presents our first opportunity to meaningfully interpret the Submission Clause, we begin our analysis by identifying the governing legal standard. We then apply that standard to the present case and conclude that Amendment D was not submitted to the voters as the constitution requires.

> 1. A Proposed Constitutional Amendment Cannot Be "Submitted" to Voters if the Ballot Title Would Mislead a Reasonable Voter as to What They Are Voting For or Against

¶67 To interpret the meaning of the Submission Clause, we begin with the constitutional text. *See State v. Barnett*, 2023 UT 20, ¶ 10, 537 P.3d 212 ("When we interpret the Utah Constitution, the text's plain language may begin and end the analysis." (cleaned up)). Before a proposed amendment can become part of the Utah Constitution, the Submission Clause requires that "the said amendment . . . be submitted to the electors of the state for their approval or rejection." UTAH CONST. art. XXIII, § 1. To satisfy this requirement, the proposed constitutional amendment must appear in some form on the ballot.[3]

---

[3] Neither side here contends that the amendment's full text must be printed on the ballot to satisfy the Submission Clause. Such a requirement would be out of step with historical practice. In the earliest example, the proposed amendment was merely identified on the ballot by article and section number. In 1897, it was proposed to amend article six of the constitution to add a thirty-second section. *See* S.J.R. 6 § 3, 1897 Leg., Gen. Sess. (Utah 1897) (available at https://images.archives.utah.gov/digital/collection/428/id/165143/rec/43). According to the proposed resolution, neither the text of the amendment nor a summary of it would be printed on the ballot. *Id.* Instead, the resolution instructed that ballots would be printed to ask simply whether voters were "For" or "Against" "the

(continued . . .)

¶68 Although the Submission Clause does not specify how the ballot must be worded, the text implicitly requires ballot language that accurately describes the proposed constitutional amendment. After all, "the said amendment" cannot be "submitted to the electors of the state for their approval or rejection" unless the ballot informs the voters of the change they are being asked to approve or reject. *See id.* While the Submission Clause does not require a ballot summary, if the Legislature chooses to include one, it must accurately describe the amendment. Otherwise, something other than "the said amendment" has been submitted to the voters. *See id.*

¶69 This interpretation is consistent with how other states have construed similar submission clauses to mean that ballot language cannot be deceiving or misleading. *See South Salt Lake City v. Maese*, 2019 UT 58, ¶ 59, 450 P.3d 1092 ("When interpreting our constitution, we have, at times, found it useful to examine sister state law.") These courts reason that their constitutions' submission clauses implicitly require "that the proposed amendment be *accurately* represented on the ballot; otherwise, voter approval would be a nullity." *Armstrong v. Harris*, 773 So. 2d 7, 12 (Fla. 2000). They recognize that while the legislature has discretion in "the

---

amendment adding section thirty-two to article six of the Constitution." *Id.*

Another early example shows that sometimes a short description of a proposed amendment has been included on the ballot. In 1900, it was proposed to amend the constitution to authorize laws by initiative. *See List of Nominations*, LOGAN JOURNAL, Oct. 30, 1900 (available at https://newspapers.lib.utah.edu/search?facet_type=%22page%22&gallery=1&rows=200&parent_i=25029544#g4). In addition to identifying the article and section of the constitution to be amended, the ballot included a short, seven-word description of the change: voters were asked whether they were "For" or "Against" the "Amendment proposed to Sections 1 and 22, Article 6 of the Constitution, providing for Direct Legislation by the people." *See id.*

An additional example is referenced in *Snow v. Keddington*, 195 P.2d 234 (Utah 1948), which quotes the ballot language for a 1946 constitutional amendment as "A Joint Resolution Proposing to Amend Section 10, Article VIII of the Constitution of the State of Utah, Relating to the Election and Duties of County Attorneys and Fixing the Term Thereof." *Id.* at 236.

form and manner of submitting the question of a constitutional amendment to the people," that discretion is subject "to the implied limitation that [the ballot question] must not be so unreasonable and misleading as to be a palpable evasion of the constitutional requirement to submit the law to a popular vote." *Breza v. Kiffmeyer*, 723 N.W.2d 633, 636 (Minn. 2006) (per curiam) (cleaned up). This "limitation" ensures that ballot language "enable[s] the voters to express their choice on the amendments presented." *Kahalekai v. Doi*, 590 P.2d 543, 552–53 (Haw. 1979).

¶70 Despite this general agreement, state courts appear to disagree about the specific standard that applies in submission clause cases. One state asks whether the "clear and essential purpose of a proposed amendment is fairly expressed in the ballot question." *Samuels v. City of Minneapolis*, 966 N.W.2d 245, 251 (Minn. 2021) (cleaned up). Another asks whether the "ballot question is factually inaccurate in a fundamental way." *Wis. Just. Initiative, Inc. v. Wis. Elections Comm'n*, 990 N.W.2d 122, 141 (Wis. 2023). Still another asks whether the proposed amendment is presented on the ballot "in such form and language as not to deceive or mislead the public." *Kahalekai*, 590 P.2d at 553.

¶71 Here, the parties agree that the Submission Clause requires some degree of accuracy. The Legislature concedes that, at the very least, a proposed amendment is not "submitted" if the ballot "presents 'an entirely different question' than the Legislature's joint resolution proposing the amendment." (Quoting *Wis. Just. Initiative, Inc.*, 990 N.W.2d at 139.) In its view, however, courts should defer to the Legislature when deciding whether an amendment has been "submitted" in compliance with the Submission Clause. Courts should not, the Legislature continues, view the Submission Clause as "an invitation to referee word games between amendment opponents and amendment proponents and the Legislature."

¶72 Plaintiffs, for their part, urge us to borrow the standard that the Florida Supreme Court described in *Armstrong*. There, the court declared that "where a proposed constitutional revision results in the loss or restriction of an independent fundamental state right, the loss must be made known to each participating voter at the time of the general election." *Armstrong*, 773 So. 2d at 17–18 (cleaned up). The court reasoned, "When . . . citizens are being called upon to nullify an original act of the Founding Fathers, each

citizen is entitled—indeed, each is duty-bound—to cast a ballot with eyes wide open." *Id.* at 22.

¶73 But we are not writing on a blank slate. Although we have yet to interpret the Submission Clause, we addressed the closely related question of whether ballot language was "legally sufficient" in *Nowers v. Oakden*, 169 P.2d 108 (Utah 1946). *Id.* at 116. We turn to that case for guidance.

¶74 In *Nowers*, this court considered whether Beaver County had complied with a statute that allowed counties to adopt a local fencing ordinance subject to approval by the county's voters. *See id.* at 111–12. The Beaver County Commission passed an ordinance that would require property owners to "fence their farms and premises" and would "allow domestic animals to run at large." *Id.* at 116. The Commission then called a special election in which the voters were asked to vote "Fence Yes" or "Fence No." *Id.* at 115. "Fence Yes" received a majority of votes, allowing the ordinance to take effect. *Id.*

¶75 Many years later, a landowner sued for damages to his land caused by the defendant's trespassing cattle. *Id.* at 111. The defendant asserted that Utah law did not allow a landowner to recover damages "where such premises are not inclosed [sic] by a lawful fence in counties where a fence is required by law." *Id.* (cleaned up). The trial court rejected the defense because "no valid fence law was enacted or established for Beaver County." *Id.* The court awarded damages, and the defendant appealed. *See id.*

¶76 On appeal, this court considered whether the local fencing ordinance had been submitted to the voters as required by statute. *Id.* at 115–16. Because there was "no general legislative mandate as to how a proposition must be worded on the ballot," this court evaluated "whether the proposition to be submitted was, in light of the circumstances of its submission, framed with such clarity as to enable the voters to express their will." *Id.* at 116. This court recognized that "[t]he proposition to be voted on must, of course, be placed on the ballot in such words and in such form that the voters are not confused thereby." *Id.* Stated differently, "[t]he ballot together with the immediately surrounding circumstances of the election must be such that a reasonably intelligent voter knows what the question is and where he must mark his ballot in order to indicate his approval or disapproval." *Id.*

¶77 In concluding that the ballot language met that standard, this court noted that the special "election was called for only one

purpose, namely, to have the citizens vote on whether or not they should fence their farms and allow domestic animals to run at large." *Id.* The court also noted that the ordinance had been published in the manner required by statute and "specifically provided for the *form* and *wording* of the ballot." *Id.* This court held "that considering all the surrounding circumstances the ballot used in the case at bar was legally sufficient and that no reasonably intelligent voter was misled thereby as to what he was voting for or against." *Id.*

¶78 We adopted the standard in *Nowers* to test the legal sufficiency of ballot language proposing a local ordinance. *See id.* at 115–16. Ballot language proposing a constitutional amendment deserves no less scrutiny. And although we did not identify the source of the legal sufficiency requirement in *Nowers*, the Submission Clause supplies a textual basis for adopting that requirement when a constitutional amendment is at issue.

¶79 Accordingly, we hold that, under the Submission Clause, "the said amendment" has not been "submitted to the electors of the state," UTAH CONST. art. XXIII, § 1, unless the proposed amendment is "placed on the ballot in such words and in such form that the voters are not confused thereby," *Nowers*, 169 P.2d at 116. To meet this standard, "[t]he ballot together with the immediately surrounding circumstances of the election must be such that a reasonably intelligent voter knows what the question is." *Id.* The proposition must be "framed with such clarity as to enable the voters to express their will" and ensure that "no reasonably intelligent voter" would be "misled . . . as to what he was voting for or against." *Id.* Simply stated, if the ballot title would mislead a reasonable voter as to what they are voting for or against, the proposed amendment has not been submitted to the voters as the constitution requires.[4]

¶80 In applying this standard, we agree with the Legislature that courts should not split hairs when reviewing ballot language.

---

[4] When *Nowers* speaks of "a reasonably intelligent voter," it is employing the familiar reasonable-person standard. *See Youngblood v. Auto-Owners Ins.*, 2007 UT 28, ¶ 34, 158 P.3d 1088 (noting that the "reasonable person standard" has been "known for centuries in the law"). The reasonable-person standard is "an objective test, i.e., what would a reasonable person conclude under these circumstances." *Id.* (cleaned up).

The question is not whether a better or more accurate ballot title could be drafted, but whether, as an objective matter, the ballot title would mislead a reasonable voter as to what they are being asked to approve or reject. The way in which the Legislature discharges its constitutional duty to submit a proposed amendment to the voters is entitled to deference, so long as it does not violate the constitution.

¶81   We also decline Plaintiffs' invitation to adopt a special rule that would require the ballot title to explicitly alert voters that a proposed amendment might alter a fundamental right. *See Armstrong*, 773 So. 2d at 17–18, 22. This is because the general rule we adopt sufficiently addresses such a situation. If a ballot title's omission of information about a proposed amendment's impact on a constitutional right renders it misleading to a reasonable voter, then it will not pass constitutional muster. The reverse would also be true. If such an omission does not render it misleading, then the ballot language would not violate the submission requirement.

¶82   In all cases, the question remains the same: would the ballot title mislead a reasonable voter as to what they are voting for or against?

> 2.   The Ballot Title for Amendment D Would Mislead a Reasonable Voter as to What They Are Voting For or Against

¶83   With this legal standard in mind, we turn to the ballot title for Amendment D. Although our constitution does not require a proposed amendment to appear on the ballot in any particular form, the Legislature has enacted a statute requiring "a ballot title for each proposed amendment" that includes a summary of the subject matter of the amendment and a summary of any legislation that "will become effective upon the voters' adoption of the proposed constitutional amendment." UTAH CODE § 20A-7-103(3)(c). Earlier this year, the Legislature reassigned the task of drafting the ballot title to the presiding officers of the House and Senate. *See* Election Law Revisions, S.B. 37 § 8, 2024 Leg., Gen. Sess. (Utah 2024).

¶84   For Amendment D, the language drafted by the presiding officers for inclusion on the ballot provides as follows:

> *Should the Utah Constitution be changed to strengthen the initiative process by:*

- Prohibiting foreign influence on ballot initiatives and referendums.

- Clarifying the voters and legislative bodies' ability to amend laws.

*If approved, state law would also be changed to:*

- Allow Utah citizens 50% more time to gather signatures for a statewide referendum.

- Establish requirements for the legislature to follow the intent of a ballot initiative.

*General Election Certification* at 34–35.

¶85 To determine whether a reasonable voter would be "misled" as to what they are "voting for or against," *Nowers*, 169 P.2d at 116, we must compare the ballot title to the amendment itself. Recall that Amendment D proposes three additions to the Utah Constitution. First, it specifies that the people's right to alter or reform the government may be exercised only as provided by the constitution. *See supra* ¶ 25. This aspect of Amendment D does not change existing law, but merely enshrines a portion of our holding in *League of Women Voters I. See* 2024 UT 21, ¶¶ 104, 136, 157, 160. Although the ballot title does not address this aspect of the amendment, Plaintiffs have not challenged the ballot title on that basis.

¶86 Second, Amendment D would ban foreign influence in the initiative and referendum processes. *See supra* ¶ 26. This change is reflected in the ballot title, and Plaintiffs have not alleged that the description is misleading.

¶87 Third, Amendment D provides that when the people use their legislative power to pass an initiative or referendum, the constitution "does not limit or preclude" legislative bodies from exercising "Legislative power, including through amending, enacting, or repealing a law." *See supra* ¶ 27. With respect to this third change, Plaintiffs allege that the ballot title is misleading and inaccurate because it "deceives voters into believing that a vote in favor of [Amendment D] will strengthen their constitutional right to legislate by initiative" when, in reality, the amendment will eliminate current constitutional limits on the Legislature's ability to repeal or amend government-reform initiatives.

¶88 We agree with the district court that Plaintiffs have demonstrated a substantial likelihood of success on the merits of

this claim. The ballot title does not accurately state the question voters are being asked: whether the constitution should be changed to remove existing limits on the Legislature's power to override government-reform initiatives. Instead, the ballot title would lead a reasonable voter to believe that Amendment D will merely "clarify" legislative authority and "strengthen" the initiative process. The ballot title also tells voters that the contingent legislation will "establish" requirements for the legislature to follow the intent of ballot initiatives, when voters are actually being asked to give up existing constitutional protections in exchange for limited statutory protections that can be repealed at any time. Finally, the surrounding circumstances cannot remedy the confusion where the ballot title is inaccurate. We expand on each of these points below.

### a. The ballot title omits a key part of the question

¶89   A proposed constitutional amendment is not "submitted" to the voters unless it is "placed on the ballot in such words and in such form that the voters are not confused thereby." *Nowers*, 169 P.2d at 116. To satisfy this standard, a reasonable voter must be able to understand "what the question is." *Id.* But nothing in the ballot title tells voters that Amendment D will change the constitution to allow legislative bodies to amend, enact, or repeal any law, even if those laws were enacted by the people through a government-reform initiative.

¶90   To better understand how Amendment D would reshape the constitutional landscape, consider the current lay of the land, which we surveyed in *League of Women Voters I*. In that case, we recognized that the right to alter or reform the government is "a fundamental right." 2024 UT 21, ¶ 111. Although that right can be exercised only "within the bounds of the constitution," the initiative provision of article VI "provides the people with a direct, legislative means of exercising their right to reform the government." *Id.* ¶ 104.

¶91 The people's fundamental rights place corresponding limits on the Legislature's power. "[W]hen Utahns exercise their right to reform the government through a citizen initiative, their exercise of these rights is protected from government infringement. This means that government-reform initiatives are constitutionally protected from unfettered legislative amendment, repeal, or replacement." *Id.* ¶ 11.

¶92 These limits are the product of a basic tenet of constitutional law—"that legislative action cannot unduly infringe or restrain the exercise of constitutional rights." *Id.* The power to govern, granted to the State through our constitution, is subject to the rights retained by the people. For 124 years, the Utah Constitution has protected the right of the people to enact government reforms through initiative.[5] Laws that are enacted through the exercise of this right are not subject to unfettered amendment or repeal by the Legislature.

¶93 Although the Legislature is not free to disregard these laws, it still has the ability to refine them as needed. The Legislature can change initiative-enacted, government-reform laws in two circumstances. First, it can make any manner of supporting amendments that promote the government reform. *Id.* ¶¶ 11, 162. In other words, even if a successful initiative enacts government reforms, the Legislature is free to amend the resulting laws so long as those amendments are helpful in achieving the intended reform. Because these types of amendments do "not implicate" the people's fundamental right to alter or reform the government, *id.* ¶ 11, they are not subject to strict scrutiny.

---

[5] The people of Utah retained the right to alter or reform the government when they ratified the Utah Constitution in 1895, and they have enjoyed a constitutional right to legislate by initiative since 1900. But this court was only recently asked to determine whether those rights limit the Legislature's ability to change laws enacted by a government-reform initiative. This court decides such constitutional questions only when parties raise them, and in the 124-year history of the initiative right, only seven initiatives have passed. Utah voters did not successfully use their initiative power to pass a law until 1960. And, until the successful voter initiatives in 2018, no legislature had ever immediately undone a law that the voters had just approved. Given that history, it is not surprising that Plaintiffs were the first party to allege that a successful initiative had enacted a government reform and that the Legislature had disregarded the will of the people by subsequently changing the law in a way that undermined the reform. That does not mean that the constitutional protections recognized in *League of Women Voters I* did not exist until that opinion was issued. It simply means that no party previously had occasion to invoke those constitutional protections.

¶94 Second, the Legislature can change the law in a way that impairs the reform if the change meets strict scrutiny. *Id.* ¶¶ 11, 162. To satisfy that standard, the change that impairs the reform must be "narrowly tailored to advance a compelling government interest." *Id.* ¶ 202.

¶95 Amendment D eliminates these existing constitutional restraints on the Legislature's ability to amend laws that result from government-reform initiatives. The proposed language instead provides that the constitution places no limits on the Legislature's power to amend, enact, or repeal any law that the people have enacted by initiative or repealed by referendum.

¶96 The ballot title for Amendment D does not disclose this constitutional change. Currently, the people's fundamental right to alter or reform their government limits the Legislature's ability to amend laws passed by government-reform initiatives. Amendment D alters that balance of power between the people and the Legislature by giving the Legislature authority to amend or repeal such laws. Because the ballot title fails to mention the constitutional power transfer at the heart of Amendment D, the Legislature did not submit the true amendment to voters. Voters cannot "know[] what the question is"—thus enabling them "to express their will" on Amendment D—when the summary presented on the ballot omits a key part of the question. *See Nowers*, 169 P.2d at 116.

### b. The included language does not accurately describe the amendment

¶97 Not only does the ballot title omit a central feature of Amendment D, but the included language would lead a reasonable voter to believe that the amendment does something entirely different. The ballot title promises that Amendment D will "strengthen the initiative process by . . . [c]larifying the voters and legislative bodies' ability to amend laws." *See General Election Certification* at 34. The statement inaccurately describes the amendment by claiming that (1) the change is merely "clarifying" the legislature's ability to amend laws, (2) the change affects "the voters[']" ability to amend laws, and (3) the change will "strengthen" the "initiative process."

¶98 First, the use of the word "clarifying," *see id.*, understates the constitutional sea change that Amendment D would effect. To "clarify" commonly means "to make understandable" or "to free of confusion." *Clarify*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/clarify (last visited Oct. 22, 2024).

Amendment D changes rather than clarifies. Specifically, it changes the existing constitutional protections that limit the Legislature's ability to amend government-reform initiatives. Yet by telling voters that the amendment clarifies the Legislature's ability to amend laws, the ballot title suggests there are no existing constitutional limits in place and that the voters are not being asked to approve a change to the existing framework. This compounds the potential confusion caused by omitting a central feature of Amendment D.

¶99  Second, the ballot title inaccurately states that Amendment D would clarify "the voters['] . . . ability to amend laws." *See General Election Certification* at 34. In truth, the amendment does not affect voters' ability to amend laws. The relevant language applies only to the power of legislative bodies to amend laws and says nothing about voters' ability to do so. Telling voters that the amendment will clarify their ability to amend laws when the amendment does no such thing is not only confusing, but counterfactual.

¶100 Third, the claim that the amendment will "strengthen the initiative process" would mislead a reasonable voter as to what they are voting for or against. The Legislature maintains that the claim is factually accurate because Amendment D would strengthen the initiative process by banning foreign influence.[6] *See Id.* Although one could reasonably characterize the prohibition on foreign influence as a change that would "strengthen the initiative process," the structure of the ballot title makes clear that the phrase "strengthen the initiative process" modifies both the first bullet point (relating to foreign influence) and the second (relating to the ability to amend laws). *See id.*

¶101 As an objective matter, Amendment D does not "strengthen the initiative process by . . . [c]larifying the voters and the legislative bodies' ability to amend laws." *See id.* As explained above, the amendment makes no changes to the voters' right to amend laws. And, if anything, the changes to the Legislature's

---

[6] The Legislature also argues that Amendment D strengthens the initiative process because the contingent legislation would add time to gather signatures in support of a referendum. But the referendum process is distinct from the initiative process. And, in any event, the first section of the ballot title describes the constitutional amendment itself, which has no effect on the referendum process.

ability to amend laws weakens the people's initiative right by allowing the Legislature to amend or repeal any initiative, even if it implicates the people's right to alter or reform their government.

¶102 But the Legislature points out that the ballot title does not speak to the initiative *right*; the ballot title claims only that Amendment D will strengthen the initiative *process*. In the Legislature's view, allowing elected representatives unlimited constitutional power to change laws enacted by initiative is good public policy because it means that "grassroots-led initiatives can . . . be refined as necessary through the legislative process." Amendment D would implement this policy by scrapping the current constitutional framework, which the Legislature describes as a "rigid and unmanageable system that disrupts our republican form of government," and replacing it with a framework that fosters the "process of refining and reforming law—and sometimes changing it wholesale."

¶103 We do not weigh in on this policy question. But we fail to see how such legislative freedom strengthens the initiative process, which begins when the people file an initiative application, *see* UTAH CODE § 20A-7-201(1)(a), and ends when a proposed initiative becomes law, *see id.* § 20A-7-212. If thereafter the Legislature amends or repeals the law, it does not do so through the initiative process. There is no factual basis for asserting that Amendment D strengthens the initiative process by empowering legislative bodies to amend or repeal initiative-enacted laws after the initiative process has run its course.

¶104 More importantly, our decision does not turn on whether certain words and phrases, in isolation, are susceptible to a plausible meaning that comports with the amendment. The question is whether the ballot title was "framed with such clarity" that a reasonable voter "knows what the question is" and will not be "misled" as to what they are "voting for or against." *Nowers*, 169 P.2d at 116. Here, the ballot language does not tell voters that they are being asked to eliminate constitutional limits on the Legislature's ability to amend or repeal government-reform initiatives. Instead, it characterizes the changes as mere clarifications that will affect both the voters' and legislative bodies' ability to amend laws and will strengthen the initiative process. Considering both the omission and the ordinary meaning of the included language taken as a whole, Amendment D was not

"placed on the ballot in such words and in such form that the voters [would] not [be] confused thereby." *Id*.

### c. The language describing the contingent legislation is misleading

¶105 The ballot title inaccurately describes Amendment D in still another way. According to the summary, if voters approve Amendment D, then "state law would . . . be changed to . . . [e]stablish requirements for the legislature to follow the intent of a ballot initiative." *General Election Certification* at 34–35. But to "establish" commonly means to "bring into existence." *Establish*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/establish (last visited Oct. 22, 2024). And such requirements already exist: the Utah Constitution itself establishes "requirements for the legislature to follow the intent of the ballot initiative," at least where government reforms are at issue. *See supra* ¶ 91.

¶106 Amendment D eliminates those existing constitutional requirements and replaces them with a statute that would take effect if Amendment D were ratified. *See* Statewide Initiative and Referendum Amendments, S.B. 4003 § 2, 2024 Leg., 4th Spec. Sess. (Utah 2024). The contingent statute applies if the Legislature amends an initiative-enacted law "during the general session next following" the law's passage. *Id.* In that circumstance, the Legislature must generally defer "to the initiative by amending the law in a manner that, in the Legislature's determination, leaves intact the general purpose of the initiative." *Id.* But the deference requirement does not apply if the Legislature determines that an initiative-enacted law must be amended "to mitigate an adverse fiscal impact of the initiative." *Id.*

¶107 The statutory deference requirement is weaker than the existing constitutional protections in several ways. The requirement applies only to changes that are made during the next general legislative session. *Id.* No deference is due in subsequent years; nor does the statute explicitly prevent the Legislature from immediately calling itself into special session to change the initiative-enacted law without giving deference to the purpose of the initiative. The statute also empowers the Legislature itself to determine whether legislative changes leave the initiative's "general purpose . . . intact." *Id.* This insulates the Legislature from legal challenges and the corresponding check on legislative power by the judicial branch that our constitution envisions. The statute

further allows the Legislature to ignore the initiative's purpose entirely if it determines that the initiative will create "an adverse fiscal impact." *Id.* And unlike the existing constitutionally enshrined protections, the Legislature is free to amend or repeal the statutory deference requirement at any time.

¶108 In short, the promise that state law will be changed to "[e]stablish requirements for the legislature to follow the intent of a ballot initiative" is illusory. *See General Election Certification* at 35. Amendment D would eliminate existing constitutional protections for government-reform initiatives and replace those protections with a less stable statutory requirement that, in limited circumstances, the Legislature must defer to what it deems to be the general purpose of the initiative.

¶109 The Legislature correctly points out that the statute would go beyond the constitutional protections recognized in *League of Women Voters I* by adding protections for non-government-reform initiatives as well. While that is correct as far as it goes, the ballot title overstates the effect of the statutory change. By not explaining that Amendment D would eliminate the deference due to government-reform initiatives under the constitution, the description of the contingent legislation inaccurately portrays the choice that the voters are being asked to make.

d. The surrounding circumstances cannot compensate for an inaccurate ballot title

¶110 The Legislature also argues that the surrounding circumstances make up for any defects in the ballot title. Quoting *Nowers*, the Legislature says that "'reasonably intelligent voters'" will "understand what they are voting on based not only on the ballot summary but also 'the immediately surrounding circumstances of the election.'" (Quoting 169 P.2d at 116.) According to the Legislature, voiding Amendment D due to the shortcomings of the ballot title "demeans the State and its voters" because Utahns know how to "read, think, and vote for themselves."

¶111 The Legislature asks that we consider the other publicly available sources of information related to Amendment D, including the Legislature's website, which displays Amendment D's full text; the Lieutenant Governor's website and public notice, which also display the amendment in full; the voter information pamphlet, which will include the amendment's text, an analysis of the amendment written by the House Speaker and Senate

President, and arguments on both sides of the issue written by appointed legislators; the postings of the amendment text at all in-person polling locations; the extensive news coverage of the amendment; and the newspaper ads published the week of September 16. In the Legislature's view, these additional data points adequately inform voters about Amendment D's full implications, no matter what the ballot title says.

¶112 The Legislature is correct that, under the *Nowers* standard, we view ballot language in light of "the surrounding circumstances." 169 P.2d at 116. In *Nowers*, we held that the rather cryptic ballot language—"Fence Yes" or "Fence No"—was not misleading when considered "together with the immediately surrounding circumstances of the [special] election." *Id.* at 115–16. Whether property owners should be required to fence their farms was the only question on the ballot and the county commission had published the proposed ordinance as required, including the exact language that would be printed on the ballot. *Id.* at 116. Under those circumstances, we held that "no reasonably intelligent voter" would have been "misled . . . as to what he was voting for or against." *Id.*

¶113 Unlike the ballot title at issue in this case, the language printed on the ballot in *Nowers* was accurate. At most, it was unclear what a vote for "Fence Yes" or "Fence No" would signify. In that situation, the court considered whether a reasonable voter would be confused by the ballot language given the immediately surrounding circumstances.[7]

---

[7] Unlike in *Nowers v. Oakden*, 169 P.2d 108 (Utah 1946), we are not in the position of looking back after the election to assess the extent to which the "surrounding circumstances" may have informed the voters' decision. On the date we heard oral argument, election day was almost six weeks away and the voter information pamphlet had yet to be published. We would have had to predict "the immediately surrounding circumstances of the election," *id.* at 116—including the wording of the voter information pamphlet, the extent and content of news reporting, and the availability of other sources of information—to assess whether a reasonable voter would understand what they were being asked to vote on. Prior to the election itself, we cannot fully evaluate whether the surrounding circumstances could ameliorate the problems with a ballot title.

¶114 But this case does not present a situation where the ballot language is ambiguous or susceptible to different meanings. The ballot title purports to describe Amendment D, yet it omits that the constitution will be changed to allow the Legislature to amend or repeal any government reform enacted by voter initiative. And the language that is included incorrectly suggests that the changes will strengthen the initiative process, affect the voters' ability to amend laws, and merely clarify the Legislature's ability to amend laws.

¶115 Where the ballot title is not just ambiguous but misstates the question presented, the surrounding circumstances will not satisfy the Submission Clause. A reasonable voter might be expected to look to other sources when faced with a vague ballot title. But voters are entitled to trust that the language printed on the ballot accurately reflects the proposed amendment they are being asked to approve. If the availability of other information could cure a misleading ballot title, it would put the onus on voters to question and verify the accuracy of the ballot. Not only would that approach undermine public confidence in the election, but it would also contravene the Submission Clause by allowing something other than "the said amendment" to be submitted to the voters. UTAH CONST. art. XXIII, § 1. Because the ballot title does not accurately reflect the proposed amendment, Amendment D has not been submitted to the voters as the constitution requires.

B. *The Legislature Did Not Cause Amendment D to Be Published in Newspapers Across Utah for Two Months Leading up to the Election*

¶116 The district court also ruled that Plaintiffs had shown a substantial likelihood of success on the merits of their Publication Clause claim. The Legislature urges us to reverse because it believes the district court "misinterpreted that text and disregarded the Legislature's evidence showing both actual and substantial compliance with the Publication Clause."

¶117 Again, we begin with the constitutional text. *See Barnett*, 2023 UT 20, ¶ 10. If a proposed constitutional amendment passes by two-thirds in each house, the Utah Constitution states that "the Legislature shall cause the [proposed amendment] to be published in at least one newspaper in every county of the state, where a newspaper is published, for two months immediately preceding the next general election." UTAH CONST. art. XXIII, § 1. This method of publishing proposed amendments "prescribed by the

constitution is one reasonably calculated to give notice to the voters." *Snow v. Keddington*, 195 P.2d 234, 238 (Utah 1948).

¶118 The Legislature contends that it complied with the Publication Clause. It points out that it made the text of Amendment D available on its website when it announced the special session. And since that time, newspapers throughout the state have published articles about Amendment D, including at least one article that linked to the full text of the amendment on the Legislature's website. In addition, the full text of the amendment was posted on Utah's public notice website and on the Lieutenant Governor's webpage. And on September 11, 2024, the Legislature "purchased advertising space in 35 printed newspapers 'to publish the ballot title and full text of'" Amendment D "'in each [printed] newspaper during the week of September 16, 2024.'" (Brackets in original.)

¶119 These actions do not satisfy the text of the Publication Clause. Specifically, the Legislature did not "[1] cause the [proposed amendment] to be published [2] in at least one newspaper in every county of the state, where a newspaper is published, [3] for two months immediately preceding the next general election." UTAH CONST. art. XXIII, § 1. Below, we explain the meaning of each requirement and why those requirements were not met.

1. The Legislature Did Not "Cause" Amendment D to Be Published in Newspapers

¶120 The Legislature argues that it caused Amendment D to be published in newspapers by making the proposed amendment available to the press to publish as it saw fit. According to the Legislature, the Publication Clause only requires it "to take steps to make Amendment D available to the people in their newspapers—even if online ones." The Legislature reasons that it took those necessary steps by

- publicly announcing it was holding a special session to consider Amendment D,

- introducing S.J.R. 401 with the full text of Amendment D,

- making the full text of Amendment D continuously available on the Legislature's website, which "news outlets could—and did—publish the text and/or provide a link to," and

- directing the Lieutenant Governor to submit Amendment D to the voters "in the manner provided by law," which the Lieutenant Governor did by issuing a public notice that "can be reproduced in newspapers across the state."[8]

¶121 But the constitution does not command the Legislature to make the amendment available for potential publication. It commands the Legislature to "cause" that publication. At the time of Utah's founding, the verb "cause" meant "[t]o effect; to be the occasion of." *Cause*, WEBSTER'S ACADEMIC DICTIONARY (1895). It was synonymous with "[t]o create; produce; beget; effect; occasion; originate; induce; bring about." *Id.*

¶122 Reading the constitution with this definition in mind, we conclude that the Publication Clause explicitly requires the Legislature to effect, produce, or bring about the publication of the proposed amendment "in at least one newspaper in every county of the state, where a newspaper is published, for two months immediately preceding the next general election." UTAH CONST. art. XXIII, § 1. The Legislature's actions did not produce that result. Until the Legislature purchased newspaper ad space for the week of September 16, the full text of Amendment D had not been published in a single newspaper, let alone in a newspaper in every county in which a newspaper is published.

¶123 Requiring governmental entities to publish public notices in newspapers is not as extraordinary as the Legislature suggests. Until 2023, dozens of statutes in the Utah Code directed state agencies, local municipalities, and other state actors to publish public notices in newspapers. *See* Public Notice Requirements, S.B. 43, 2023 Leg., Gen. Sess. (Utah 2023). Still, the Legislature is correct that the Publication Clause does not require "the Legislature itself to publish" the amendment "by buying ad space in 35 newspapers across the state." We agree that it can fulfill its constitutional obligation by "tak[ing] steps to 'cause' others to publish" the

---

[8] The Legislature also notes that it took the "additional and unprecedented step[]" of buying ad space to run the text of Amendment D in thirty-five newspapers across Utah the week of September 16. That is certainly one way in which the Legislature could "cause" the publication, but because that action did not meet the Publication Clause's timing requirements, *see infra* Part I.B.3, we consider it only as part of the Legislature's substantial compliance argument.

amendment, as long as it is published as an official notice to voters in the manner required by the constitution.

¶124 Historically, the Legislature caused the required publication by passing a statute that delegated the duty to another state actor. Shortly after the ratification of the Utah Constitution, the Legislature directed the secretary of state to publish several proposed constitutional amendments in newspapers.[9] More recently, the Legislature assigned the Lieutenant Governor the task of accomplishing the constitution's publication requirement. *See, e.g.*, Utah Code § 20A-7-103(2) (2008); *id.* § 20A-7-103(2) (2002); *id.* § 20A-7-103(2) (1995).

¶125 In 2023, however, the Legislature updated the Utah Code to replace most newspaper publication requirements with a new system of posting public notices to government websites. *See* Public Notice Requirements, S.B. 43, 2023 Leg., Gen. Sess. (Utah 2023). As part of that overhaul, it amended the statute in which it had delegated its Publication Clause duty to the Lieutenant Governor and removed the language that required publication in newspapers. *Compare* Utah Code § 20A-7-103(2) (2022) (requiring the Lieutenant Governor to "publish the full text of the amendment . . . in at least one newspaper in every county of the state where a newspaper is published"), *with id.* § 20A-7-103(2) (2023) (requiring the Lieutenant Governor to "publish the full text of the amendment

---

[9] *See* Proposing an Amendment to Section 6, Article 10, of the Constitution, H.J.R. 7 § 2, 1897 Leg., Gen. Sess. (Utah 1897) (available at https://images.archives.utah.gov/digital/collection/432n/id/3198/rec/46); Proposing an Amendment to Section Three, Article Thirteen of the Constitution, H.J.R. 23 § 2, 1897 Leg., Gen. Sess. (Utah 1897) (available at https://images.archives.utah.gov/digital/collection/432n/id/2744/rec/4); Proposing an Amendment to Be Known as Section Thirty-two, Article Six, of the Constitution, S.J.R. 6 § 2, 1897 Leg., Gen. Sess. (Utah 1897) (available at https://images.archives.utah.gov/digital/collection/428/id/165139/rec/43); Proposing an Amendment to Section Nine, Article Eight, of the Constitution, S.J.R. 7 § 2, 1897 Leg., Gen. Sess. (Utah 1897) (available at https://images.archives.utah.gov/digital/collection/428/id/165146/rec/43); Proposing an Amendment to Section Ten of Article Seven of the Constitution, S.J.R. 9 § 2, 1897 Leg., Gen. Sess., (Utah 1897) (available at https://images.archives.utah.gov/digital/collection/428/id/165161/rec/43).

. . . as a class A notice under Section 63G-30-102, through the date of the election"). Since amending the statute, the Legislature has taken no other steps to "cause" the publication of proposed constitutional amendments in the manner required by the Publication Clause. Because the Legislature did not "cause" the required publication of Amendment D, the amendment cannot be submitted to the voters consistent with the constitution.

### 2. Amendment D Was Not Published in "Newspapers"

¶126 The Legislature also argues that the Publication Clause's newspaper requirement simply reflects the principle that the public must be given notice of the amendment. The Legislature contends that it provided Utahns with such notice by publishing the text of Amendment D on its website and directing the Lieutenant Governor to submit the proposed amendment to voters "at the next regular general election in the manner provided by law," i.e., issuance of a public notice. The Legislature reminds us that "[t]he Utah Constitution enshrines principles, not application of those principles," and urges us to apply the "principle [that] underlies Article XXIII's publication requirement: notice."

¶127 But this is not a case in which the constitutional language captures a general principle. *See Planned Parenthood Ass'n of Utah v. State*, 2024 UT 28, ¶ 126, 554 P.3d 998 ("The proper inquiry focuses on what principle the constitution encapsulates and how that principle should apply."). The Publication Clause does not simply require publication in a manner designed to provide sufficient notice to the public. It dictates a particular type of notice—publication of the proposed constitutional amendment "in at least one newspaper in every county of the state, where a newspaper is published." UTAH CONST. art. XXIII, § 1.

¶128 We are seldom faced with interpreting a constitutional provision so specific. But, when the constitutional language directs a particular action, we are not at liberty to generalize that requirement to an abstract principle. Nor can we substitute an alternative means of accomplishing the constitutional provision's apparent objective. We simply cannot read the word "newspaper" out of the Publication Clause.

¶129 The Legislature also argues that the term "newspaper," as used in the Publication Clause, is not limited to newspapers as they existed in 1895. The Legislature urges us to reject the argument that because "the internet did not exist in 1895 . . . the original public

meaning of 'newspaper' could only mean a physical, printed newspaper." By that logic, the Legislature reasons, the First Amendment would not protect an online media outlet because it does not use a printing press, and the Second Amendment would protect only muskets and firelocks because no other "arms" existed in 1791. Instead, the Legislature contends, constitutional language applies to the "modern forms" of the nouns used.

¶130 We agree with the Legislature that the meaning of constitutional language is not frozen in amber. *See United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024); *see also Barnett*, 2023 UT 20, ¶¶ 57–58. What constitutes a "newspaper" today might well be different from what was envisioned during the founding era. But this case does not turn on whether "newspaper" includes modern versions, like newspaper websites or electronic editions.[10] Other than during the week of September 16, the Legislature did not "cause" the text of the amendment to be published in *any* newspaper, online or otherwise.

¶131 Plaintiffs have provided historical evidence showing that prior proposed constitutional amendments—including the most recent amendment in 2021—were published in newspapers as the Publication Clause requires. That is unsurprising given that, until this year, the Legislature expressly directed the Lieutenant Governor to publish proposed amendments "in at least one newspaper in every county of the state where a newspaper is published." *See* UTAH CODE § 20A-7-103(2) (2008); *see also id.* (2002); *id.* (1995).

¶132 The Legislature may have a point that the newspaper publication requirement is outdated, but it cannot rewrite the constitution by statute. Nor can this court rewrite it by opinion. "Under our constitutional requirements, notice must be carried in the newspapers . . . ." *Snow*, 195 P.2d at 238. Unless and until the constitution is amended to remove the newspaper publication

---

[10] The Legislature claims that the district court's interpretation of "newspaper" was "limited to printed physical papers," but we can find no language to that effect in the district court's ruling. While Plaintiffs have argued for that interpretation, limiting "newspaper" to printed versions could undermine the purpose of the Publication Clause, especially if the only newspaper published in a particular county is fully online.

requirement, we will continue to interpret the Publication Clause as written.

    3.   The Legislature Did Not Cause the Publication of Amendment D in Newspapers "for Two Months Immediately Preceding" the Election

¶133 The Legislature contends that even under the "most stringent reading" of the phrase "for two months immediately preceding the next general election," it met the requirements of the Publication Clause. The Legislature claims that it met those requirements by causing the amendment "to be published for 60 continuous days before election day"—pointing to the announcement of the special session, the Legislature's website making Amendment D available to newspapers, and news articles published with excerpts of Amendment D and links to the full text as early as seventy-six days before the election. The Legislature argues that we do not need to "resolve when publication must start and how many times it must occur" because "by any measure, the Legislature took steps to cause continuous publication beginning more than 60 days before" the election.

¶134 Because we have rejected the Legislature's argument that these actions caused the publication in newspapers as specified by the Publication Clause, we need only determine whether the Legislature's purchase of newspaper ad space the week of September 16 satisfied the timing requirement. Even assuming that the text of Amendment D appeared in each newspaper beginning on September 16 and in each issue published during that week, one week of publication fifty days before the election does not satisfy the requirement that the amendment be published "for two months." Based on the text of the Publication Clause, the contemporary meaning of the words used, and historical practice, we conclude that the phrase "for two months immediately preceding the next general election" requires continuous publication in each issue of the relevant newspapers beginning two months prior to the election.

¶135 The Publication Clause's plain language requires publication "*for* two months." UTAH CONST. art. XXIII, § 1 (emphasis added). As defined at the time of the founding, the word "for" "[m]ay mean 'during.'" *For*, BLACK'S LAW DICTIONARY (1st ed. 1891). Black's Law Dictionary expounds on this definition by providing the following example:

> As, in Neb. Code, § 947 which requires public notice of the time and place of the sale of realty upon execution to be given "for at least thirty days" before the day of sale by advertisement in some newspaper. One publication thirty days before the sale would not, therefore, be sufficient.

*Id.* Similarly, it is not sufficient to cause the text of Amendment D to be published for a single day or week *within* two months of the election, as occurred here. The constitution requires the Legislature to cause the proposed amendment to be published *for* two months prior to the election. Properly understood—and as informed by historical practice—this means that proposed amendments are to be published continuously for two months leading up to the election.

¶136 Until 2002, the Legislature seems to have understood that the Publication Clause requires precisely that. Plaintiffs point out that the Legislature previously discharged its duty under the Publication Clause by statutorily requiring that the Lieutenant Governor publish a proposed amendment in the required newspapers "not later than 60 days before the regular general election." UTAH CODE § 20A-7-103(2) (2001). But beginning in 2002, the Publication Clause's timelines fell by the wayside. *See id.* (2002) (changing the timeframe to "not more than 60 days or less than ten days before the regular general election"); *see also id.* (2008) (changing the timeframe to "not more than 60 days or less than 14 days"). Despite these statutory changes, the Publication Clause itself has not changed. It still requires publication "for two months."

¶137 And if we look to historical practice shortly after the Publication Clause's adoption, we see that the Legislature caused proposed amendments to be published not just once during the two-month window leading up to the election, but *continuously* during that period. For example, in 1898, the Legislature caused five constitutional amendments to be published in *every* issue of newspapers across the state for at least two months before election day:

- *The Davis County Clipper* (Davis County) published the amendment text weekly for sixty-six days (September 2 through November 7);[11]

- *The Eastern Utah Advocate* (Carbon County) published weekly for sixty-four days (September 1 through November 3);[12]

- *The Grand Valley Times* (Grand County) published weekly for sixty-three days (September 2 through November 4);[13]

- *The Ogden Daily Standard* (Weber County) published daily (Monday through Saturday) for sixty-two days (September 6 through November 7);[14]

- *The Salt Lake Tribune* (Salt Lake County) published daily for sixty-two days (September 7 through November 8);[15]

---

[11] *Davis County Clipper*, https://newspapers.lib.utah.edu/search?page=2&facet_paper=%22Davis+County+Clipper%22&facet_type=issue&date_tdt=%5B1898-01-01T00%3A00%3A00Z+TO+1898-12-31T00%3A00%3A00Z%5D.

[12] *Eastern Utah Advocate*, https://newspapers.lib.utah.edu/search?page=2&facet_paper=%22Eastern+Utah+Advocate%22&facet_type=issue&date_tdt=%5B1898-01-01T00%3A00%3A00Z+TO+1898-12-31T00%3A00%3A00Z%5D.

[13] *Grand Valley Times*, https://newspapers.lib.utah.edu/search?facet_paper=%22Grand+Valley+Times%22&facet_type=issue&date_tdt=%5B1898-01-01T00%3A00%3A00Z+TO+1898-12-31T00%3A00%3A00Z%5D.

[14] *The Ogden Daily Standard*, https://newspapers.lib.utah.edu/search?page=9&facet_paper=%22Ogden+Daily+Standard%22&facet_type=issue&date_tdt=%5B1898-01-01T00%3A00%3A00Z+TO+1898-12-31T00%3A00%3A00Z%5D.

[15] *The Salt Lake Tribune*, https://newspapers.lib.utah.edu/search?page=10&facet_paper=%22Salt+Lake+Tribune%22&facet_type=issue&date_tdt=%5B1898-01-01T00%3A00%3A00Z+TO+1898-12-31T00%3A00%3A00Z%5D.

- *The Vernal Express* (Uintah County) published weekly for sixty-four days (September 1 through November 3);[16]

- *The Wasatch Wave* (Wasatch County) published weekly for sixty-three days (September 2 through November 4).[17]

¶138 The plain language and these historical materials lead us to conclude that the Publication Clause requires the Legislature to publish proposed amendments in newspapers throughout the state continuously for two months leading up to the general election. Because the Legislature did not do that here, we hold that it did not comply with the Publication Clause.

4. Even if Substantial Compliance Could Satisfy the Publication Clause, the Legislature Cannot Demonstrate that It Substantially Complied

¶139 The Legislature next argues that, at minimum, it substantially complied with the Publication Clause. The Legislature urges this court to join other states that have held that substantial compliance with constitutional publication requirements is sufficient. And the Legislature claims that it substantially complied with the Publication Clause because it caused the amendment to be published in thirty-five printed newspapers during the week of September 16, and thereafter on the Utah Press Association's website. It argues that "those steps—combined with the Legislature's website, the Lieutenant Governor's notices, the Voter Information Pamphlet, and the deluge of press coverage"— rendered harmless "[w]hatever minor deviations Plaintiffs allege."

¶140 As an initial matter, we question whether substantial compliance could satisfy the Publication Clause. Our constitution dictates that its provisions "are mandatory and prohibitory, unless by express words they are declared to be otherwise." UTAH CONST. art. I, § 26. This language "means that because each part of the

---

[16] *The Vernal Express*, https://newspapers.lib.utah.edu/search?page=2&facet_paper=%22Vernal+Express%22&facet_type=issue&date_tdt=%5B1898-01-01T00%3A00%3A00Z+TO+1898-12-31T00%3A00%3A00Z%5D.

[17] *The Wasatch Wave*, https://newspapers.lib.utah.edu/search?page=2&facet_paper=%22Wasatch+Wave%22&facet_type=issue&date_tdt=%5B1898-01-01T00%3A00%3A00Z+TO+1898-12-31T00%3A00%3A00Z%5D.

constitution is 'mandatory and prohibitory,' courts cannot ignore the constitution." *Barnett*, 2023 UT 20, ¶ 27. On its face, the Publication Clause sets forth strict conditions that must be met before a proposed constitutional amendment can be put to the voters. *See* UTAH CONST. art. XXIII, § 1. And "courts are not free to pick and choose which parts of the constitution they will enforce." *Barnett*, 2023 UT 20, ¶ 27.

¶141 But we need not foreclose the argument for future cases because here the Legislature cannot demonstrate substantial compliance in any event. If we were to adopt a substantial compliance standard, it would apply only if the Legislature tried to comply with the Publication Clause but fell short. *See State v. Cline*, 224 N.W. 6, 8–9 (Neb. 1929) (holding substantial compliance did not apply where "there was no attempt to follow the governing constitutional or statutory provisions as to publication of notice"); *accord Op. of the Justs.*, 275 A.2d 558, 563 (Del. 1971) (explaining that "substantial compliance may not be predicated upon no compliance"); *Mayer v. Adams*, 186 S.E. 420, 424 (Ga. 1936) (applying substantial compliance "under circumstances where there was obviously an attempt in good faith to comply with the Constitution").

¶142 This is not a case in which the Legislature attempted to comply but overlooked a particular county newspaper or submitted the notice a day late. Even after the Legislature was alerted on September 7 to the failure to comply with the Publication Clause, it did not immediately take remedial action. On September 11, the Legislature purchased ad space in thirty-five newspapers, but even then, it did not cause Amendment D to be published continuously until the date of the election. The Legislature also relies on the fact that voters had many opportunities to learn about the amendment, but the availability of other sources of information does not speak to whether the Legislature substantially complied with its constitutional mandate to publish the entire text of the amendment for two months prior to the election. Thus, even assuming the Publication Clause could be satisfied by substantial compliance, the Legislature's actions do not meet that threshold.

5. The Legislature Is Not Entitled to a Narrower Injunction Ordering It to Comply with the Publication Clause

¶143 Lastly, we consider the Legislature's request for a narrower injunction. The Legislature claims that the preliminary

injunction is overbroad and "goes well beyond Plaintiffs' particular asserted claims." In its view, if the district court "considered the relevant 'facts and circumstances'—namely, the particular violations that Plaintiffs allege—it would have been obvious that there are more appropriate remedies short of canceling the Amendment D vote." The Legislature suggests that enjoining the Legislature to comply with the requirements of the Publication Clause would be a narrower alternative to the injunction voiding Amendment D.

¶144 First and foremost, this issue was not preserved at the district court level and was waived on appeal. The Legislature never asked for a narrower injunction below. *See Patterson v. Patterson*, 2011 UT 68, ¶¶ 12–13, 266 P.3d 828 (explaining that, absent "limited exceptions," we "will not consider an issue unless it has been preserved" by raising it before the district court "in such a way that the court ha[d] an opportunity to rule on it" (cleaned up)). And on appeal, the Legislature did not challenge the scope of the injunction until its reply brief. *See Brown v. Glover*, 2000 UT 89, ¶ 23, 16 P.3d 540 ("Generally, issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court.").

¶145 But even if we were to overlook these procedural defects, when the Legislature raised this argument, there was insufficient time to cure the Legislature's violation of the Publication Clause through a more tailored preliminary injunction. Our constitution requires two months of continuous publication, which gives "the voter time to consider the merits or demerits of the proposed change" before casting a ballot. *Snow,* 195 P.2d at 238. The Legislature had already missed that deadline before Plaintiffs filed the second motion for a preliminary injunction in the district court. The Legislature first suggested a narrower injunction in its reply brief on appeal, and when this court heard oral argument just two days later, a third of the two-month period had already elapsed. Even if we had required publication that very day, it would not have been an adequate substitute for the two months voters are entitled to under our constitution.

¶146 Furthermore, even if the Publication Clause violation could be cured, the Submission Clause violation cannot. The ballots have already been printed. And the Legislature has not suggested a way to fix the ballot language at this late date.

## II. THE DISTRICT COURT ACTED WITHIN ITS DISCRETION WHEN IT FOUND THAT THE OTHER PRELIMINARY-INJUNCTION FACTORS WEIGH IN PLAINTIFFS' FAVOR

¶147 Having concluded that the district court correctly interpreted and applied the constitution in assessing Plaintiffs' likelihood of success, we now consider whether the court abused its discretion in weighing the remaining preliminary-injunction factors. On those factors, the district court found that (1) Plaintiffs will suffer irreparable harm in the absence of an injunction, (2) the injury threatened to Plaintiffs outweighs whatever damage the proposed injunction may cause to the enjoined parties, and (3) the injunction is not adverse to the public interest. *See* UTAH R. CIV. P. 65A(e)(2)–(4). In making those findings, the district court did not abuse its discretion.

### A. Plaintiffs Have Shown Irreparable Harm

¶148 Courts are empowered to issue preliminary injunctions to prevent "irreparable harm," *id.* R. 65A(e)(2), which is harm that "cannot be adequately compensated in damages or for which damages cannot be compensable in money," *Hunsaker v. Kersh*, 1999 UT 106, ¶ 9, 991 P.2d 67 (cleaned up). The ultimate harm Plaintiffs allege here is the risk that voters will unwittingly surrender a constitutional right because Amendment D was not submitted or publicized as the constitution requires. *See supra* Part I. And that harm is a constitutional wrong that damages cannot right. *Cf. Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) ("[T]he violation of a constitutional right must weigh heavily in [the irreparable harm] analysis.").

¶149 The submission and publication requirements are not mere boxes to be checked before votes can be tallied; they are constitutional safeguards designed to ensure that voters have the information and time necessary to cast an informed vote on a matter as weighty as a constitutional amendment. If those requirements are unfulfilled, it would be unconstitutional to allow a proposed amendment to go into effect.

¶150 Still, the Legislature argues that Plaintiffs cannot show irreparable harm based on the mere "possibility" that Amendment D will pass. While we acknowledge that the constitutionality of Amendment D could be adjudicated after the election if needed, Plaintiffs allege a related harm that demands a preliminary injunction at this time. If Amendment D were put to a vote despite ongoing litigation, Plaintiffs allege that the vote would be shrouded

in uncertainty. On that point, the Legislature agrees, adding, "Without certainty that their vote will count, [voters] might not educate themselves about the pros and cons of Amendment D, voice support for Amendment D, or even mark 'For' or 'Against' on the ballot."

¶151 If that uncertainty were to loom during the lead-up to the election, advocates on both sides of Amendment D would continue their efforts to get out the vote. Plaintiffs would continue to invest time and money to educate voters and encourage them to vote against the amendment. Proponents of Amendment D would likewise expend resources with the aim of getting the amendment passed. Without clarity about Amendment D's legal status, those resources would be wasted if, at the end of the day, the vote would have no effect.

¶152 Both sides agree that it is best to clear up any uncertainty now. Plaintiffs have urged that an injunction would "*prevent* voter confusion," and the Legislature agrees that "Utah voters need to know now whether Amendment D . . . is valid." Having a definitive answer about the status of Amendment D will "reduce, if not eliminate voter confusion." *See Kim v. Hanlon*, 99 F.4th 140, 160 (3d Cir. 2024). Under these circumstances, the district court acted within its discretion in finding that Plaintiffs will suffer irreparable harm without a preliminary injunction prior to the election.

### B. *The Balance of Harms Favors Plaintiffs*

¶153 The next preliminary-injunction factor considers whether the injury threatened to Plaintiffs "outweighs whatever damage the . . . injunction may cause" the Legislature. *See* UTAH R. CIV. P. 65A(e)(3). Given that the district court correctly assessed the merits of Plaintiffs' claims, it did not abuse its discretion in finding that the balance of harms tipped in Plaintiffs' favor.

¶154 We do not discount the significant harm the preliminary injunction may cause the Legislature. It was the Legislature, after all, that proposed Amendment D. In its view, the amendment is of utmost importance in safeguarding the policy-making process by banning foreign influence and providing the Legislature with full authority to amend or repeal ill-conceived initiatives. Through Amendment D, the Legislature also seeks to eliminate the uncertainty around questions that were not before the court in *League of Women Voters I*, including whether the constitution limits

the Legislature's power to amend laws that are enacted through non-government-reform initiatives.

¶155 We recognize the Legislature's legitimate and weighty interest in proposing a constitutional amendment that it deems necessary to govern the state effectively. And we respect and defer to its constitutional authority to propose amendments as it sees fit. But we must balance those interests against the harm of allowing the vote on Amendment D to proceed when it will ultimately be declared unconstitutional.

¶156 Importantly, the injunction here does not bar the Legislature from ever placing Amendment D before the voters; it only prevents the Legislature from doing so in this year's election. The Legislature may submit Amendment D to the voters in the 2026 general election if it follows the steps mandated by the constitution.[18] The district court did not abuse its discretion when it found that the harm to Plaintiffs in submitting an unconstitutional amendment to the voters outweighs the harm to the Legislature in delaying the vote on Amendment D until it complies with the constitution.

C. *The Injunction Is Not Adverse to the Public Interest*

¶157 The final factor requires a finding that the injunction "would not be adverse to the public interest." *Id.* R. 65A(e)(4). The Legislature argues that the effect of the preliminary injunction— "depriving 1.7 million Utahns from voting on Amendment D"—is adverse to the public interest. In the Legislature's view, the district court abused its discretion by issuing an injunction that would disenfranchise voters who wish to exercise their constitutional right to alter or reform their government through Amendment D.

¶158 The public has a strong interest in voting on proposed constitutional amendments that are properly presented to them.

---

[18] We note that Utahns are not being asked to vote on any initiatives in this year's election. So even if voters were to approve Amendment D this year, no new initiative-enacted laws would be impacted. We also note that the ban on foreign support of initiatives could be addressed by statute during the 2025 legislative session. Although we do not suggest that a statute can be an adequate replacement for the constitutional amendment the Legislature proposed, it would, to some degree, mitigate the harm the Legislature asserts will flow from the injunction.

The people of Utah hold a fundamental right to alter or reform their government in a manner consistent with the constitution. One way in which the people can exercise that right is by voting on constitutional amendments that the Legislature proposes.

¶159 Many voters—both for and against—want to vote on Amendment D. But our constitution can be amended only by following the procedure set forth in its text. The constitution does not give the people a right to amend the constitution unless the proposal originates with the Legislature. By the same token, the constitution requires the Legislature to take certain steps to publish and submit their proposal to the voters, so the people know what changes to our state's founding document they are being asked to accept or reject.

¶160 The people of Utah struck a balance between the legislative authority of the people and that of the Legislature in 1900 when they gave themselves the initiative power and, in so doing, established a direct means by which they could alter or reform their government. Utahns of today could decide to change that balance and give the Legislature explicit constitutional authority to amend or repeal any citizen initiative, including those that reform the government. It is exclusively the Legislature's province to propose such an amendment. And the people of Utah are empowered to decide whether to accept or reject the Legislature's proposal. We respect their right to do so. But it is this court's duty to ensure that the constitution is followed. Because it was not followed here, the public's interest is best served by delaying the vote on Amendment D until the proposed amendment is presented to voters in the manner authorized by the constitution.

## CONCLUSION

¶161 Much has been made of the fact that Amendment D was proposed in reaction to our decision in *League of Women Voters I*. That fact is of no concern to the court. When we interpret the constitution, we are not selecting our preferred interpretation based on what we believe reflects wise public policy. *See Richards v. Cox*, 2019 UT 57, ¶ 1, 450 P.3d 1074. We are doing our level best to interpret the Utah Constitution according to its original public meaning. If the people of Utah believe that our interpretation is contrary to the public interest, they can and should amend the constitution. That is an essential part of our constitutional framework that allows the people to alter or reform their government as the public welfare requires.

¶162 Under that same framework, the Legislature must propose a constitutional amendment before the people can express their will at the ballot box. That process does not offend the constitution; it respects it. But because amending the constitution is weighty business, the people of Utah dictated specific procedures that must be followed to ensure voters understand what they are being asked to do.

¶163 In the case of Amendment D, those constitutionally mandated procedures were not followed. That is a legal determination, not a policy choice. We respect the Legislature's constitutional role in proposing amendments and express no opinion on the wisdom of Amendment D. That is a matter for the voters to decide. But the Utah Constitution allows that to happen only when the question is properly placed before them.

¶164 Because Amendment D was not submitted to the voters in the way our constitution requires, it is void. Although it is no longer possible to remove Amendment D from the printed ballots, any votes for or against the amendment will have no effect. Accordingly, the preliminary injunction entered by the district court is affirmed.

———————————